Booth, Judge,
delivered the opinion of the court.
The plaintiff company is the final successor of a business enterprise organized for the purpose of contracting with the United States to furnish the Post Office Department mail *18 package boxes. The boxes to be furnished were invented by William H. Spencer, and the original contract to furnish them was made by Spencer on March 8,1893, for a four-year period. Subsequent to March 3, 1893, the present plaintiff company was incorporated under the laws of the State of West Virginia and acquired by proper assignment all the right, title, and interest of said Spencer in the patented mail package box here in issue, as well as the contract theretofore made by said Spencer. The cost to the United States under the original Spencer contract was $9 for each box furnished. In February, 1895, a date subsequent to the assignment of the original contract to the plaintiff company, an amendment was made to the original contract of 1893, providing an increased compensation to the company of $1.25 for each box furnished under the amended agreement. The amendment was brought about through representations made by August W. Machen, then superintendent of the Free-Delivery Bureau of the Post Office Department, that the boxes furnished should be elevated off the ground, and to accomplish this purpose suggested the employment of iron legs. Mr. Isaac S. McGiehan, president and owner of 90 per cent of the stock of the plaintiff company, received the suggestion of Machen during a personal interview upon the subject, and at the same time and in pursuance of a like suggestion from Machen agreed in writing to pay to one George E. Lorenz, of Toledo, Ohio, a royalty of 50 cents for each box made under the amended contract.
In 1897 the plaintiff company obtained another four-year contract, differing from former ones in one respect only, the price to be paid for each box was again increased to $10.00, and royalties were paid as per agreement to Lorenz until by his direction they were paid directly to August W. Machen. In 1901 the plaintiff company was again awarded the package box contract at the advanced price of $10.80 per box. Under the contract of 1901 the plaintiff company furnished 778 boxes at the contract price of $10.80 each and 25 combination-boxes at $25.80 each, amounting to $9,047.40. The department had received and accepted the boxes, but subsequently refused payment therefor on the ground of fraud in the procurement and execution of the contract. The pur *19 chases of boxes was discontinued and the contract thereafter treated as void. The present suit is to recover for the boxes so furnished and delivered, or in any event their value.
This is the third suit involving the fraudulent transactions brought to light in the exposures incident to the administration of the Free Delivery Service of the Post Office-Department during the period here mentioned. In each of the previous cases the court discussed at length the principles of law at issue, and finds it now inexpedient to again do more than refer to said cases, one of which reached the Supreme Court on appeal. Crocker v. United States, 240 U. S., 74; Michigan Steel Box Co., 49 C. Cls., 421.
It is vigorously contended by the plaintiff company that denial of judgment under the contract on the ground of fraud can alone be predicated upon “ absolute fraud in the inception of the contract or .the performance of the same ”; that mere suspicions and insinuations involving conjecture fall short of proof of actual fraud alone sufficient to avoid responsibility. If it is vital under the law to prove by express assertion that fraud permeated the transaction here involved under the circumstances contended for by the plaintiff company, the defense would undoubtedly fail. The burden rests upon the defendants; they have assumed it, and once having brought the parties into a situation where rational explanation alone can avail to divest the transaction of its fraudulent character, fraud must be considered proven, notwithstanding the absence of confessions and admissions. It must, of course, be directly connected with the contract, either at its inception or during the performance thereof. A variety of means, cunningly devised as in this case, so decidedly extraordinary and unusual when tested by the ordinary and rational methods of general business transactions, must be explained by the plaintiff company before it can be heard to say that its monetary transaction with an important governmental official in direct charge of the administration of its contract is free from fraud. A wide latitude is permissible in the introduction of testimony tending toward the proof of fraud, and the courts justly frown upon attempts to restrict the fullest investigations as to its presence or absence from transactions wherein it is alleged to obtain. *20 The Chief Justice discussed the subject exhaustively in the Michigan Steel Box case, supra.
The president of the plaintiff company admits having an interview with Machen and Lorenz some time previous to the amendment of the contract of 1893. Machen introduced Lorenz to him as his partner in some oil business. So far as the record discloses, the amendment of the contract was the subject under discussion, and Lorenz subsequently profits in virtue of the amendment to the extent of 40 per cent of the increased compensation thereafter provided. The justifiable pretense set forward is one so utterly absurd as to merit condemnation. The payment is alleged to have been made as a royalty on a patented device. The device was never patented and no letters patent were shown the president of the company, who was himself an experienced and active patent lawyer. This fact, standing alone, is sufficient to condemn the transaction as fraudulent. When, however, it is fortified by the additional circumstances that payments of alleged royalties were made directly to Machen in envelopes mailed to him carrying no other explanation than bank checks drawn by the treasurer of the plaintiff company in his individual capacity, against his own private funds, which had been augmented for this very purpose from the corporate funds of the company, it becomes absolutely convincing of a fraudulent and sinister purpose to profit at the expense of the Government in the performance of the contracts and to purposely conceal the transaction by giving it the appearance of personal dealing between the parties aside from any connection with the company’s business. It is inconceivable that experienced business men should resort to practices so glaringly irregular upon any other hypothesis than an abnormal desire to overreach the defendants in the sale of package boxes. This they did, for each contract provided for increased prices, notwithstanding the utter absence of the slightest reliable testimony of enhanced cost of production.
The payment of a portion of the profits earned in the performance of a Government contract directly to the Government official having personal charge and supervision of the execution of the contract is inherently a business transaction *21 of such a questionable character that nothing short of a clear, unequivocal explanation can free it from an intentional purpose to thereby influence and control the action of said official to the gain and profit of the contractor.
In 1901 payments to Machen and Lorenz under the 1901 contract were arbitrarily discontinued, the contract between the plaintiff company and Lorenz rescinded, and, in so far as this record discloses, without the slightest protest or objection on the part of Lorenz or Machen. In other words, Lorenz was submitting without contest to the loss of alleged royalties, amounting at least to $1,875, which had been collected by his agent Machen (exclusive of amounts paid directly to Lorenz) and deposited to Machen’s personal bank account during a period of time slightly in excess of a year. The explanation of this unusual procedure is far from convincing. It is ascribed to a change in the design of the standards or legs used to elevate the box, thereby releasing the company from liability to Lorenz. Lorenz never possessed a monopoly of any design. The legs used for the purpose were simple iron standards never patented and doubtless not entitled to patent. The real purpose is found elsewhere. The company failed in 1901 to secure a postal contract and the president thereof was aggrieved over the fact. Favors from the department ceased to flow with that easy, uninterrupted success that accompanied the bids submitted by the plaintiff company in 1895, 1897, and 1901, with respect to mail-package boxes.
The record is replete with positive testimony directly connecting the plaintiff company with payments of money intended and designed to reach a high Government officer and thereby enable him to participate in the profits of the contract. As well said in the Michigan Steel Box Co. case, sufra:
“And it does not materially alter the question whether said superintendent had a financial interest in the contract or the profits supposed to flow therefrom, or was actuated by gratuities furnished him by claimant, or by the hope thereof, for in either case the law will not tolerate a breach of trust on the part of a public official or allow such breach to be made the basis of an action.”
*22 The fraud practiced had its inception in the amendment made to the contract of 1893 and extended without interruption through the contracts of 1897 and 1901. Payments of money were made to Machen up to as late as September, 1901, and were only then discontinued because of the apparent unwillingness of Machen to continue in his fraudulent conduct with the company.
It is possible for the plaintiff company to recover in the present suit upon a quantum vdlebat. The Government accepted the boxes, retained possession of the same, and they are now in use. We have searched the record in an effort to find sufficient proof upon which to rest such a judgment. Plaintiff company made no effort to prove the value of the boxes furnished other than the bald statement that its profits amounted to $3 on each box. The defendants put in some testimony showing the probable cost of manufacture, but it is so indefinite as to leave the court without a basis of computation upon which to reckon the total cost of the 803 boxes involved in this, litigation. The plaintiff company’s petition is broad enough to have included this feature of the claim, but for lack of proof it must necessarily fail.
The petition is dismissed.