On February 19, 1960, the court issued an order referring to Trial Commissioner W. Ney Evans under Rule 37 (c) the plaintiff’s motion for an order disallowing claims of privilege asserted by defendant in response to orders for the production of documents by way of discovery. On July 11, 1960, the commissioner filed the following opinion and recommendation:
OPINION OK COMMISSIONER*
I
Although more than 7 years have elapsed since this action was begun, issue has not yet been joined on the pleadings.
The original and amended petitions were merged in a “consolidated” petition, filed on December 9, 1958. Prior thereto, two counterclaims were filed by defendant, but answer to the merits of the consolidated petition has not been filed. Pending, instead, are defendant’s motions (1) for a more definite statement and (2) to strike various portions of the petition.
The consolidated petition contains 86 paragraphs of narration comprising the foundation for 10 succeeding counts for breach of contract seeking recoveries aggregating some $10 million. In a sentence, the claim is that the Department of the Army wantonly and fraudulently forced plaintiff’s debtor into bankruptcy in pursuit of a contrived default termination of its supply contracts, as a means of avoiding the Department’s obligations under termination for convenience *826 of the Government, which, would have required termination settlements.
Defendant’s counterclaims total $4,664,266.55 and consist of four items: (1) unpaid balances on 15 promissory notes, $2,276,822.07; (2) unliquidated balances of payments advanced, $1,000,000; (3) excess costs incurred in reletting supply contracts, $916,000; and (4) assessed deficiencies on divers Federal taxes, $471,444.48.
Defendant’s motion for a more definite statement of certain allegations in the consolidated petition asks (1) for specificity in relation to “other contracts” alleged to have been held by the contractor at the time of its bankruptcy; (2) for a statement of “the manner in which it will be claimed that ‘the defense agencies concerned illegally terminated’ the contracts”; and (3) for an itemization of “the ‘termination settlement costs and charges’ for which plaintiff now claims reimbursement.”[1] Information is also requested as to plaintiff’s efforts, if any, to obtain relief through administrative procedures.
Plaintiff responded to defendant’s action with a motion for discovery through the production of documents. The motion was made under the call rule (Eule 27) for a call upon the Department of the Army.[2] In allowing the motion the court ordered the production of designated classes of documents “subject to any claim of privilege which the head of the department may make, if any; any such claim shall be accompanied with a statement showing the basis therefor.”
The response by the Department of the Army[3] reported that “all Army files relating to Utility Electronics Corporation that could be located have been assembled and are being made available, with certain exceptions, to the plaintiff for inspection, copying, or photographing.” The response then continued:
*827 With respect to tbe above mentioned exceptions, I have concluded, under tbe provisions of 28 U.S.C. 2507, that tbe production of certain classes of documents would not be in tbe public interest, and they bave been removed from the approximately twenty to twenty-five linear feet of files which are being made available to the plaintiff. These removed documents can be classified in two categories: documents which are the work product of attorneys in the Department of the Army, for example, those reports developed for use in the various litigation matters concerning the Government and the plaintiff; and those documents evidencing advisory opinions, recommendations, or free and open advisory comments from subordinate officials to their superiors. These two categories of documents are also considered to be privileged and not subject to production under generally recognized concepts of privilege as understood in the law of evidence.
In the instant proceeding—
Plaintiff * * * moves that the Court enter its order providing as follows: (i) for disallowance of the claims of privilege asserted by the Department of the Army in response to the Court’s Orders for Call, issued herein on March 18, 1959; (ii) requiring production of the documents withheld as assertedly privileged; and (iii) in the event said documents are not produced, for the dismissal of defendant’s counterclaims with prejudice and the disqualification of defendant from presenting witnesses or documents in opposition to plaintiff’s claims, as provided by Rule 36(b) (ii).
Alternatively, plaintiff prays that an order be entered under Hule 26 compelling production of the withheld documents, on similar conditions, in the event of defendant’s failure to produce.
Plaintiff prays that oral argument be granted on this motion.
This is the motion which was referred to the trial commissioner pursuant to Rule 37 (c).
If the motion had been confined to Rule 2'7, the assertion of the public interest privilege under 28 U.S.C. 2507 would have ended the matter. The alternative prayer “that an order be entered under Rule 26” is therefore crucial to the issue, since only under Rule 26 is the claim of executive privilege confined to privilege as that term is understood in the law of evidence. Benson v. United States, 133 Ct. Cl. 11 (1955).
*828 Defendant does not now contend that issue has not been joined under Eule 26.[4] It does contend (1) that plaintiff has not established necessity for the withheld documents, wherefore the claim of privilege should be upheld as in Kaiser Aluminum & Chemical Corporation v. United States, 141 Ct. Cl. 38 (1958), and (2) that if the court should be of a contrary opinion on the element of necessity, it is nevertheless precluded on constitutional grounds[5] from disallowing the claim of privilege, citing United States v. Reynolds, 345 U.S. 1 (1953).[6]
Defendant has not developed the constitutional issue in detail, being content, apparently, to defer argument until satisfied the issue has been squarely raised.
Whereas defendant emphasizes language in Kaiser, supra, which it says “connects executive privilege with the waiver of *829 sovereign immunity,”[7] and asserts that “this is also true in * * * Reynolds * * the point in both Reynolds and Kaiser which impresses the writer is that in each instance the United States was excused from compliance with an order to produce because the plaintiff in the action failed to satisfy the court of the necessity for production, and not because the court lacked power to inquire into the assertion of privilege.
Therefore, upon the authority of Reynolds, Kaiser, and Benson, supra, this opinion proceeds upon the premises: (1) that defendant has invoked privilege as that term is understood in the law of evidence; (2) that the court itself must determine whether the circumstances are appropriate for the claim of privilege; and (3) that the showing of necessity, under the circumstances of this case, will determine whether the claim of privilege should be sustained or rejected.
II
Many of the narrative facts in the case are undisputed.
Plaintiff is the trustee (and former receiver) in bankruptcy of Utility Electronics Corporation (hereinafter called Utility) .[8]
Prior to June 28,1950 (when the Korean hostilities began), Utility submitted to three branches of the Armed Forces fixed-price competitive bids on a series of contracts for the manufacture of electronic equipment. Pursuant thereto Utility was awarded 13 prime contracts[9] and 2 subcontracts.
As of June 28,1950, Utility had four prime contracts with the Signal Corps aggregating more than $3 million. On June 30, 1950, the Signal Corps awarded to Utility three additional contracts, aggregating more than $8 million. At the time of these awards Utility’s finance and credit arrangements with private banks were deemed adequate to its needs by both the Signal Corps and the contractor.
*830 One of the contracts of June 30,1950, called for the manufacture of walkie-talkie radios. Another of the contracts of that date called for the manufacture of handy-talkie radios. The two contracts totaled more than $6 million, and represented approximately one-half of Utility’s contracts during 1951-1952. Both types of portable transmitter-receiver radios were relatively new. Neither had been mass-produced.
These two contracts for portable radios and five other production contracts of Utility contained identical provisions for termination by the Government (1) for default and (2) for the convenience of the Government. The essence of default was the failure of the contractor to make deliveries of satisfactory equipment on time, for which the contractor was to bear the burden. The convenience clause, on the other hand, required the Government to make a termination settlement with the contractor, if the Government invoked the clause. The contracts provided, moreover, that a termination for default should be deemed a termination for convenience if it should appear that failure to perform was due to causes beyond the control and without the fault or negligence of the contractor.
Within a short time after the beginning of hostilities in Korea, increases occurred in the costs of labor and materials by reason of which Utility quite obviously faced heavy losses in the performance of its fixed-price contracts. Its pre-Korea credit arrangements were disrupted, and further credit was refused except on the basis of a guaranty by the Government of 100 percent.
Authority existed for the Army to make the 100 percent guaranty.[10] The Department of Defense policy approved “financing through guaranteed or direct Government loans or advance payments * * * to a supplier in cases where (1) the production * * * is essential and (2) no alternative source is readily available.”
The Signal Corps, recognizing Utility’s financial plight, urged the contractor to apply for a V-Loan, and to continue production. Procurement officials of the Army made the *831 requisite findings of essentiality of production and unavailability of alternate sources. The V-Loan was made in November 1950, to provide Utility with, a revolving credit of $3 million. At the time, Utility’s net worth was $114,000.
The V-Loan saved Utility from bankruptcy. Because the risk of loss was evident, the Assistant Secretary of the Army responsible for finance had been reluctant to approve Utility’s application, and had ultimately done so only upon the recommendation of his administrative superior, the Under Secretary of the Army responsible for procurement. The Under Secretary had been advised by Signal Corps procurement officers that the reletting of Utility’s contracts would result in price increases of more than $5 million.
The V-Loan was 100 percent guaranteed by the Army, and was secured (1) by assignment of the proceeds of all of Utility’s Government contracts and (2) by the personal guarantee of Utility’s president and his wife.
Meanwhile, the Signal Corps, in awarding contracts for the manufacture of walkie-talkie and handy-talkie radios to other manufacturers, discovered the need for standardization, so that parts of the equipment would be interchangeable in the field. Utility was instructed to hold up production while the Signal Corps worked out the standardization program. As part of the program, Utility was named leader for the manufacture of the handy-talkies, and BUA (Badio Corporation of America) became leader in the walkie-talkie field. The standardization program (1) delayed Utility’s production and (2) opened the way for readjustment of Utility’s prices on the radio contracts based on cost (without profit) of requisite engineering changes.
In May of 1951, Utility was again in dire financial straits, and once again the Army rescued it from bankruptcy. The Army bought the V-Loan, released the proceeds of Utility’s contracts from the V-Loan security to permit the transfer of such proceeds to secure an “advance payment account,” and created a new revolving fund credit of $1 million.[11] An Advance Payment Agreement was executed in July 1951. In support of it the Army again made the requisite findings *832 of essentiality of production and unavailability of alternate supply.
There followed extensive negotiations between Utility and the Signal Corps over the allowance of adjustments of Utility’s prices. The Signal Corps’ approach to price adjustments was to raise Utility’s prices on the basis of actual cost but to provide no profits. Simultaneously, there were discussions of the possibility of the award of additional contracts to Utility at prices which would permit the contractor to realize a profit.
Utility alleges that the Signal Corps promised in 1950 to award the additional contracts, as an inducement to Utility to continue production. It further alleges that the Signal Corps broke its promise to award such contracts, and ultimately refused to abide by its own determinations of price adjustments made necessary by engineering changes in the walkie-talkie contract. These are allegations which defendant has not fully answered.
As the negotiations for new awards extended into 1952, the Signal Corps’ position hardened. In April 1952, a proposal was made (within the Signal Corps) to terminate all of Utility’s contracts for convenience, at an estimated cost to the Army in termination settlements of approximately $2 million. The proposal was rejected in favor of a “termination of all contracts * * * in a manner * * * most advantageous to the Government.”
Utility was informed, in May 1952, that no new awards would be made, because the Signal Corps failed to see how Utility could possibly finance new contracts. Although Utility continued to press for new awards, and for adjustments in its subsisting contracts in the nature of price increases based on engineering changes, the Signal Corps made a further, final decision, against the award of new contracts in September 1952. At the time of this decision, determinations by the Signal Corps relative to some of the price adjustments of subsisting contracts were approaching the end of administrative channels. Such determinations were never given effect. Instead, actions were taken by the Signal Corps as hereinafter described.
*833 In the August-September 1952 discussions of Utility’s situation by Signal Corps and Army officials, it appeared that the production base of Utility’s items had been so expanded that other suppliers were available. This expansion had been effected by the Signal Corps under pressure from officials of the Army responsible for Utility’s financing. While the items themselves were as essential as ever to the national defense, the availability of other suppliers removed one pillar from the support of the requisite findings of es-sentiality. Instead of entering a limited finding as to the availability of alternate sources of supply, however, the Army entered (or sanctioned) a finding that Utility’s production was no longer essential to the national defense.
Utility’s situation was under review in September 1952 by a Deputy Under Secretary of the Army (responsible for procurement) who had entered office only 6 months earlier. His first knowledge of Utility was “around the first part of August, 1952, when he was briefed on the financial condition of the Company.” His administrative superior, the Under Secretary of the Army, was the same man who, as Assistant Secretary, had been responsible for finance at the time of the Y-Loan to Utility in 1950 and the Advance Payment Agreement in 1951.
On September 12,1952, the Deputy Under Secretary participated in a discussion with other officials of the Army concerning the status of Utility’s Y-Loan. The Deputy Under Secretary determined to recommend that the Y-Loan be called and action instituted to effect whatever collection was possible. This recommendation went to the Under Secretary.
On September 16, 1952', the Signal Corps directed its officers to withhold the Army’s countersignatures on checks drawn by Utility against the advance payment account.
On September 19,1952, the Y-Loan was called by the Federal Deserve Bank of New York.
On the same day, the Signal Corps ordered (1) the withholding of payment of price adjustments theretofore approved on the handy-talkie radio contract (under which deliveries were nearing completion); and (2) the suspension of processing of price adjustments on the walkie-talkie radio *834 contract (under which, deliveries in quantity were just beginning).
On September 24, 1952, the Army’s Comptroller was directed to freeze all funds then in the pipeline marked for payment of receivables owing to Utility.
On September 25,1952, suit was instituted against Utility and its endorsers (the company’s president and his wife) for collection of the Y-Loan.
On September 27,1952, the Under Secretary of the Army determined that the existing security for the Advance Payment Agreement was inadequate[12] and demanded additional security of $750,000 within 10 days. At the same time the Army’s countersigning officer was instructed to withhold countersignatures on withdrawals by Utility from the special account.
On October 6,1952, the Army Contract Adjustment Board denied excise tax relief on the basis of the September 12 determination that Utility’s contracts were no longer essential.
On October 9, 1952,[13] Utility suspended production and filed a petition for arrangement under Chapter XI of the Bankruptcy Act. As of this date, Utility had never failed to deliver, under any of its contracts, satisfactory equipment, on time.
On October 10,1952, the Signal Corps’ contracting officer served Utility with a notice of default, stating that the failure to furnish the demanded additional security of the Advance Payment Agreement was deemed to constitute a default of Utility’s production contracts.
On December 10, 1952, another Signal Corps contracting officer directed to plaintiff a notice of termination for default of seven of Utility’s production contracts, stating that “the default for which said termination is made is the failure of the Corporation to furnish the additional security requested in the letter of * * * 27 September 1952 * *
On January 8, 1953, the United States District Court for the District of New Jersey entered an order authorizing Utility’s receiver to file suit in the Court of Claims.[14]
*835 On January 16, 1953, the original petition in the present action was filed.
On March 2,1953, Utility was adjudicated a bankrupt.
Following the adjudication, the Government filed a petition in the bankruptcy proceeding claiming a lien, based on the Advance Payment Agreement, against all of Utility’s assets, including its inventory as well as the funds held in the advance account. Plaintiff disputed the claim on grounds, among others, that the Army had breached the Advance Payment Agreement and Utility’s production contracts. The bankruptcy court declined to determine the validity of the asserted lien, because the same issues were involved in the litigation in the Court of Claims and in the suit on the Y-Loan against Utility and its endorsers (stockholders).
On March 26,1954, by an order reserving plaintiff’s right to contest the asserted lien, the bankruptcy court directed the turnover to the Government of the balance of $226,422.11 in the advance account. And, by a similar order on September 4, 1957, the bankruptcy court directed plaintiff to turn over to defendant the sum of $450,000, plus interest, representing the proceeds of the sale to the Government, at public auction, of Utility’s assets, including its inventory.[15]
Ill
Before undertaking an analysis of the foregoing facts to determine the possibility of fraud, some of the propositions of law which are independent of that issue may be examined.
Plaintiff submits[16] that:
* * * neither the “public interest” privilege nor the “work product” protection is absolute. Rather both are subject to test as to their applicability. It therefore necessarily follows that the party asserting such privilege must identify the assertedly privileged materials with sufficient particularity to permit the test. This court so held in Robinson v. United States, 50 C. Cls. 159, 164-65 (1915) * * *.
In the Kaiser case * * * the government proceeded in accordance with the rule of Robinson. It identified the author of the document withheld, his position and func *836 tions, and described the nature of the particular document in question. * * *
Here in contrast, none of the documents withheld are identified by date, author, addressee, title or general subject matter. * * *
It is true that there is no identification of the documents withheld other than the classification by the Acting Secretary of the Army “* * * in two categories”:
documents which are the work product of attorneys in the Department of the Army, for example, those reports developed for use in the various litigation matters concerning the Government and the plaintiff; and those documents evidencing advisory opinions, recommendations, or free and open advisory comments from subordinate officials to their superiors.
A request by the writer, addressed to the trial attorney in the Department of Justice and made pursuant to the authority vested in the commissioner by Rule 37(c), for identification of the withheld documents without disclosing their contents, has been denied on the ground that such identification would contravene departmental policy as adopted and applied in relation to the Benson case.
In Kaiser, when plaintiff there raised the issue that the claim of privilege had not been made by the head of the department after actual personal consideration, the agency head advised the Attorney General (who then submitted the letter to the court) that—
The document, the disclosure of which was called for * * *, contains opinions that were rendered to the Liquidator of War Assets by a member of his staff concerning a proposed sale of aluminum plants. Those opinions do not necessarily reflect the views of, or represent the position ultimately taken by, the Liquidator of War Assets. A disclosure of the contents of documents of this nature would tend to discourage the staffs of Government agencies preparing such papers from giving complete and candid advice and would thereby impede effective administration of the functions of such agencies. * * *
The Attorney General, in forwarding the letter to the court, further represented that—
*837 * * * the document involved is a memorandum that was written by a Special Assistant to the War Assets Liquidator. His duties * * * were confined _ to recommendations and advice on program policy. He played no part in the operative events involved in the case and had no relations or discussions with plaintiff or its competitor. His use by the Liquidator on the matters here in question was in the nature of a confidential assistant.
The court, in its opinion in Kaiser, meticulously confined the issue in conformity with the foregoing advice from the agency head and the Attorney General.
* * * The Administrator’s claim of privilege * * * is susceptible of being read to claim that the document contains data, in addition to advisory “opinions.” However, we read the uncontradicted refusal to produce of the Administration through Assistant Attorney General Doub to allege that the document is “confined to recommendations and advice on program policy.” * * * If the Special Assistant played a part in the operative events, e.g., determination of costs or values, representations to Kaiser or Reynolds or survey of the plants, a different situation might exist. We therefore consider this case on the basis of a refusal * * * to produce an advisory opinion on intra-office policy * * *.
In the instant case the Acting Secretary has claimed privilege for “certain classes of documents.” He has given no intimation of how many documents, beyond the use of the plural “documents” in the description of each of two categories. By inference, there must be as many as 4 documents ; there may be 40; there may be 400.
Among the documents withheld are “documents evidencing advisory opinions, recommendations, or free and open advisory comments from subordinate officials to their superiors.” If the contents of these documents had been confined to advisory opinions on intra-office policy, the use of further designation of “recommendations, or free and open advisory comments” would have been superfluous. By inference, therefore, the “recommendations, or free and open advisory comments” differ from and are in addition to the “advisory opinions.” If no data are contained in the documents, the Acting Secretary surely would have said so.
*838 The documents passed from subordinate officials to their superiors. There is no disclaimer that these subordinates “played a part in the operative events, e.g., determination of costs or values, representations to” plaintiff “or survey of the plants,” because of which “a different situation might exist” from that in Kaiser.
This case, therefore, cannot be considered “on the basis of a refusal * * * to produce an advisory opinion on intra-office policy,” since the refusal quite obviously encompasses more than that.
The Assistant Attorney General’s letter to the Clerk in Kaiser advised that “the position taken rests on the claim of executive privilege, substantive in nature, and in this court expressed in statutory form, [28] IJ.S.C. § 2507.”
On the record now before the court in the instant case, the position of the Government must be accepted as stated above. The Acting Secretary is asserting executive privilege as to any and all documents which, in his opinion, and without further elucidation by him or the Attorney General, may be said to fall within the categories of “the work product of attorneys” or “documents evidencing advisory opinions, recommendations, or free and open advisory comments from subordinate officials to their superiors.”
The description of the advisory-recommendation category is broad enough to encompass the work-product category, and one is left to conjecture as to why they were separated. Certainly, unless it be determined that the broad claim of executive privilege based on public interest is not to be sustained, the work-product privilege will not be reached. Further discussion of the work-product claim of privilege may therefore be deferred, while attention is centered on the claim of executive privilege based on public interest.
The Acting Secretary’s description of the documents withheld leaves much to be desired. It does not follow, however, that, as suggested by plaintiff, the claim of privilege should be rejected outright for lack of specificity. Instead, consideration may proceed on the basis heretofore noted, that the Acting Secretary of the Army claims the right to withhold, under an assertion of executive privilege founded on public interest, any and all documents, which in his unreviewed *839 and unreviewable opinion, contain “advisory opinions, recommendations, or free and open advisory comments from subordinate officials to their superiors.”[17]
IV
Plaintiff further asserts[18] that “the ‘public interest’ privilege is unavailable because the United States is a complaining litigant”:
The issues in this case are not limited to plaintiff’s claims for approximately $10,000,000 on account of defendant’s alleged contract violations, but also comprehend the * * * counterclaims, for which defendant seeks judgment * * *.
* * * The authorities are plain that when the United States seeks affirmative civil or criminal relief as a complaining litigant, even in its sovereign law-enforcing capacity, it occupies the same position as any other litigant and cannot resist discovery on public interest grounds. * * * [Citing cases.]
* * * In short, defendant mistakenly seeks to invoke here a rule which applies solely “where the government is not a moving party, but is a defendant only on terms to which it has consented.” * * *
* * * In the posture of the case, it follows that the United States must waive its claim of “public interest” privilege or forego the assertion of its counterclaims against Utility. * * * [Citing cases.]
Defendant’s response to the foregoing follows:[19]
* * * in the instant case the Government is a defendant as to a claim which is cumulatively alleged to be well over $10,000,000. Defendant’s counterclaim is for only a portion of this amount — it does not seek affirmative relief over and above the amount claimed by the plaintiff. * * *
* * * The counterclaim, asserted herein, by the Government is not a suit by the Government to enforce the antitrust laws, or the Fair Labor Standards Act or a criminal prosecution, it is instead, in the main, a claim for repayment of moneys lent by the Government to the *840 plaintiff and not repaid by the plaintiff. Furthermore, when the plaintiff instituted this suit the Government then had no discretion concerning the filing of its counterclaim as “* * * it arises out of the transaction or occurrence that is the subject matter of the petition * * (Court of Claims Hule 17.)
Plaintiff’s reply follows:[20]
Actually, defendant, not plaintiff, instigated this entire litigation. Judicial proceedings were initiated when the United States, on September 25, 1952, filed suit on the Y-Loan * * *. United States v. Utility Electronies Corp., et al. (D.N.J., Civil Action File No. 929-52). By reason of the jurisdictional incapacity of the federal district courts to entertain contract claims against the United States for more than $10,000.00, the plaintiff was unable to present his claims in that court, by way of counterclaim or otherwise. 28 U.S.C. § 1846 (a) (2). He therefore brought this action, in which the United States thereupon filed its Y-Loan and other counterclaims. The New Jersey action has remained dormant pending the adjudication of this case.
While defendant has not answered the merits of the consolidated petition, other pleadings heretofore filed indicate its position to be that plaintiff’s affirmative claims should be denied, and defendant should recover on its counterclaims. Claim and counterclaim therefore represent cross-actions. Defendant is not counterclaiming solely as an offset.
Of the precedents upon which plaintiff relies for the proposition that the United States cannot resist discovery on public-interest grounds when it is seeking affirmative relief, two represent criminal prosecutions,[21] one was a proceeding in admiralty,[22] and seven were enforcement proceedings: 1 price control,[23] 2 antitrust,[24] and 4 wage and hour.[25] None *841 was a suit by tbe Government in its proprietary capacity for the collection of a debt.
The essence of these cases has been summarized in two widely quoted passages.
In United States v. Andolschek et al., 142 F. 2d 503, 506 (1944), defendants had been convicted of conspiracy to violate the internal revenue laws. The trial court had excluded reports of defendants’ dealings with “permittees” on the ground that the departmental regulation forbade the disclosure. Judge Learned Hand noted that the validity of similar regulations had been upheld in cases wherein disclosure was sought in litigation between private parties,[26] and observed:
* * * While we must accept it as lawful for a department of the government to suppress documents, even when they will help determine controversies between third persons, we cannot agree that this should include their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the documents may possess; it must be conducted in the open, and will lay bare their subject matter. The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully. * * *
The foregoing passage was cited with approval in Bowles v. Ackerman, 4 F.R.D. 260, 262 (1945), an injunction proceeding under the Emergency Price Control Act, wherein the court noted that United States v. Andolschek was “a criminal case, to be sure, but stating a principle equally applicable here.” The court further observed:
When the plaintiff saw fit to submit himself to the jurisdiction of this court, which he did by the bringing of this action, he at the same time became amenable to the Rules of Civil Procedure which, “govern the procedure in the district courts of the United States in all suits of a civil nature.” Rule 1. * * *
*842 In United States v. Reynolds, 345 U.S. 1, 12 (1953), the Supreme Court took note of Andolschek and another criminal prosecution[27] and set them apart with the following:
Eespondents have cited us to those cases in the criminal field, where it has been held that the Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented.
The emphasis defendant would place upon the last sentence of the foregoing passage is misplaced, insofar as such emphasis relates to defendant’s counterclaim. Under the circumstances of this case the suggestion that defendant is in court only by way of compulsory counterclaim is a thin reed with which to support its contention of Government immunity from discovery.
No other reason has been suggested, and none has occurred to the writer, as to why the Government, seeking affirmative relief in this court by way of counterclaim, should not be as amenable to discovery proceedings as it would be if it sought the same relief in one of the district courts, suing as a plaintiff.
There is a distinction, however, which applies here, as between the cases in the criminal field and the enforcement proceedings on the civil side. The court in Andolschek, supra, indicated that in the criminal cases the Government must choose on the basis of all or nothing.[28] The decisions in the *843 enforcement proceedings are not so emphatic.[29] Specifically, in the latter cases, the Government may be forced to choose between the production of documents and sanctions for non-production, when its claim of privilege is not upheld, but there may yet be an area wherein the Government might have a valid claim of privilege and still not have to abandon the proceedings.
The rationale of the cases cited by plaintiff is persuasive. When the Government sues a citizen in a civil action in one of its own courts, it also has a duty to see that justice is done. This duty encompasses the obligation to submit itself generally to the rules of procedure applicable to private litigants. It does not follow that the Government must choose, in any and all circumstances, to “leave the transactions in the obscurity from which a trial will draw them, or * * * expose them fully.” The assertion of privilege, including executive privilege, is a right of the Government, as a litigant, under the rules of procedure. The court may, under the circumstances of any given case, require the Government to abandon its claim of privilege or forego the suit. The decided cases, however, do not appear to say, explicitly, that the Government, when suing in its proprietary capacity to collect a debt, must forthwith choose between abandonment of the suit or abandonment of all executive privilege based on public interest.
In the absence of fully established, controlling precedents to support plaintiff’s all-or-nothing position, the court should determine the issue in terms of the circumstances of the particular case. Within this pattern the controlling factor is the element of necessity. In Reynolds, supra, the court said:[30]
* * * In each case, the showing of necessity which is made will determine how far the court should probe in satisfying itself tha,t the occasion for invoking the privilege is appropriate. Where’there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. A fortiori, *844 where necessity is dubious, a formal claim of privilege, made under the circumstances of this case, will have to prevail. * * *
There is no intimation that the claim of privilege in the instant case relates to military secrets. If, therefore, the documents withheld in this case relate only to departmental housekeeping secrets (and this is plainly the inference to be drawn from the statement of the claim of privilege), the claim should not be lightly accepted if there is a strong showing of necessity. Quaere as to the obverse of the concluding sentence in the passage from Reynolds, that where the formal claim of privilege is dubious, necessity must prevail.
This court, in Kaiser, supra,[31] said:
* * * So far as the disclosure of confidential intra-agency advisory opinions is concerned, we conclude that they belong to that class of governmental documents that are privileged from inspection as against public interest but not absolutely. It is necessary therefore to consider the circumstances around the demand for this document in order to determine whether or not its production is injurious to the consultative functions of government that the privilege of non-disclosure protects.
In the course of the Kaiser opinion the court further observed:
* * * That is not to say that every file of government papers is closed to discovery. * * *
* * * Nothing is alleged by Kaiser * * * to suggest any need for production of the document to establish facts. * * *
* * * No fraud is charged, no duality of interest, only a breach of the terms of open contracts.
Plaintiff has heretofore represented to the court, in his showing of cause for the initial order to produce, that the records of Utility following its bankruptcy were so scattered that plaintiff must depend, almost entirely, upon records in the Government’s possession for the establishment of his affirmative claims and his defenses to defendant’s counterclaims.
*845 Aside from the fraud issue, which, is separately considered hereinafter, plaintiff asserts that the cognizable amount of the counterclaim for excess costs allegedly incurred in reletting Utility’s production contracts, independently of its validity, is “vulnerable by reason of defezidant’s misconduct in disposing of Utility’s claims for engineering price adjustments and in appropriating the excess value of Utility’s inventory over the distress purchase price paid for it.”
Plaintiff would defend against the counterclaim for $1 million, representing unliquidated balances of payments advanced, on the ground that defendant’s actions in demanding additional security, in sequestering the accounts securing the Advance Payment Agreement, and in defaulting plaintiff for failure to provide the additional security, constituted breaches of the contract by defendant.
Another of plaintiff’s defenses against recoveries by defendant rests on the proposition that the action of defendant in defaulting Utility was a breach of Utility’s production contracts. These contracts, it has been previously noted, provided that in the event the Government invoked the default clauses and it thereafter appeared that failure to perform was due to causes beyond the control and without the fault or negligence of the contractor, the termination for default should be deemed a termination for convenience. Plaintiff is in position to contend that the failure of Utility to perform was due to causes beyond its control and without fault or negligence on its part, within the meaning of the production contracts.
Plaintiff cannot benefit by any of the foregoing defenses unless he can support them factually. Insofar as the withheld documents contain facts appertaining to the defenses, plaintiff is on sound ground in contending that—
* * * the necessity that “justice shall be done between litigants” dictates repudiation of the premise — inherent in the instant claims of privilege — that the executive branch can force the courts to make private parties defend against government claims for money on a record containing only those facts in the government’s possession which it deigns to divulge. * * *
*846 The record now before the court presents the anomalous situation of leaving the court uninformed as to whether the withheld documents do or do not contain facts appertaining to plaintiff’s defenses, as well as other details necessary for consideration “of the circumstances around the demand for [these] document [s] in order to determine whether or not [their] production is injurious to the consultative functions * * * the privilege of non-disclosure protects.”
Ordinarily, there might be two ways of obtaining the requisite information: (1) to ask the Government for as much detailed information as can be supplied to identify and explain the documents without revealing their contents; or (2) to require production of the documents for screening by the court (through the normal channel of reference to the commissioner) to determine whether any or all should be made available to plaintiff.
Inasmuch as the first approach has been offered to and declined by the Government, the second alternative alone is available in the instant case. Under these circumstances, “* * * the necessity for the presentation of the document [s] to a commissioner of this court, * * * for him to make a determination as to [their] privilege ‘as that term is understood in the law of evidence,’ ” has been established within the meaning of the Kaiser decision.
The court said, in Kaiser, supra:[32] “We do not think this record shows the need for examination of the privileged document.” It then added: “Circumstances may require such a course. This should not be ordered without definite showing by plaintiff of facts indicating reasonable cause for requiring such a submission.” The failure and refusal of the Government, in this instance, to identify and describe the documents, and plaintiff’s obvious need for access to such of those records in the Government’s possession as may touch upon the controverted dealings and transactions, establish reasonable cause for requiring the submission.
With respect to the authority of the court in the premises, the Kaiser opinion said:[33]
*847 * * * Tbe power must lie in courts to determine executive privilege in litigation. When the United States submits its controversies to the Judicial Department, it becomes amenable to its orders for their determination.
The Government in Kaiser was defendant in a Tucker Act case. Manifestly, the authority of the court is as fully established where the Government seeks affirmative relief as a counterclaimant in a Tucker Act case.
By way of conclusion, therefore, and confining attention to the claim of executive privilege based on public interest, as that claim has been asserted and delineated by the Acting Secretary of the Army, and as such claim relates to the prosecution of the Government’s counterclaims in this action, plaintiff’s motion for an order disallowing the claim of privilege and requiring production of the documents on pain of sanctions under Rule 36 (b) (ii) should be granted, with modifications.
Relating the claim of executive privilege to the Government’s position as a counterclaimant, defendant should be given its election: (1) to produce the documents for inspection, copying or photographing by plaintiff, as directed by the initial order and in conformity with Rule 26(a); or (2) to produce the documents for examination by the commissioner, with the right to urge before him, prior to the disclosure of the contents thereof to plaintiff, reasons which might warrant the classification of individual documents as privileged (such as, for example, absence of any relation between a specific document and defendant’s counterclaims, or that the document relates solely to intra-office advice on policy, within the narrow principle of Kaiser); or (3) accept such sanctions under Rule 36(b) (2') (ii) as may be appropriately imposed.
y
With respect to plaintiff’s asserted needs for the establishment of his affirmative claims as well as his defenses, two admiralty cases are for examination: Fireman’s Fund Indemnity Co. v. United States, 103 F. Supp. 915 (N.D. Fla. 1952), and Bank Line v. United States, 163 F. 2d 133 (2d Cir. 1947); also, 76 F. Supp. 801 (S.D. N.Y. 1948).
*848 Fireman's Fimd held, specifically, that the Government waived its privilege when it made the withheld documents available to its proctor. It was in relation to the Fireman’s Fimd decision that the writer made inquiry of defendant’s trial attorney as to whether any or all of the documents withheld by the Acting Secretary of the Army had been made available to him. The reply was that all such documents had been delivered into his hands.
Pertinent portions of the opinion in Fireman's Fund follow:
These cases came on to be heard * * * on motions of libellant, under Admiralty Rule 32, * * * to require respondent to produce * * * statements of all witnesses made to investigating Naval officers or civilian personnel employed by the United States Navy, during the course of the investigation of the accident involved in these suits and the testimony of all witnesses before the Navy Court of Inquiry convened to investigate the accident, as well as all exhibits pertaining to said accident offered and received in evidence before said Court of Inquiry.
The Secretary of the Navy has filed with the court a memorandum asserting the privileged and confidential status of these records and declined to permit their production in response to the motions filed herein. The privilege is claimed under 5 U.S.C.A., § 22, and Article 1251 U.S. Navy Regulations, 1948, as amended. * * *
The regulations referred to above vest in the Secretary of the Navy the authority to claim the privilege, which he here asserts and there is no question as to the right of the Secretary of the Navy to decline to produce the records where the public interest demands such action. Boske v. Comingore, 177 U.S. 459, 20 S. Ct. 701, 44 L. Ed. 846; Bank Line v. United States, 2 Cir., 163 F. 2d 133.
Where such action is justified, however, in cases in litigation, it is as applicable to the government counsel as to others. During the course of the argument in these cases the court gained the impression that the Navy had already furnished proctor for respondent with all the documents which proctor for libellant seeks authority to inspect and copy or photograph. If this is true, these documents have lost their privileged and confidential status. Pacific-Atlantic S.S. Co. v. United States, 4 Cir., 175 F. 2d 632. * * *
*849 Defendant urges tbat “[T]he doctrine of waiver enunciated in * * * Fireman's Fund * * * is antagonistic to the requirements of pertinent sections of the United States Code * * * [viz] 5 U.S.C. § 306, 5 U.S.C. § 91, and 28 U.S.C. § 2507.”
Section 91 of title 5 directs that in all suits brought against the United States in the Court of Claims, the Attorney General shall transmit to the interested department a copy of the petition, with a request that the department furnish to the Attorney General “all facts, circumstances, and evidence touching the claim.” The department is further directed to furnish the Attorney General with a full statement, which “shall contain a reference to or description of all such official documents or papers, if any, as may furnish proof of facts referred to in it, or may be necessary and proper for the defense of the United States * *
Section 306 of title 5 provides that “* * * officers of the Department of Justice, under the direction of the Attorney General, shall give all opinions and render all services requiring the skill of persons learned in the law necessary to enable the President and the heads of departments * * * to discharge their respective duties; and shall, on behalf of the United States, procure the proper evidence for, and conduct, prosecute, or defend all suits and proceedings in the Supreme Court and in the Court of Claims, in which the United States * * * is a party * *
Section 2507 of title 28 is the call statute applicable to the Court of Claims. Reference is made to the opinion of this court in Benson, supra, for the application of the section.
Defendant’s brief suggests that 5 U.S.C. 91 “requires that all departments turn over to the Department of Justice all information and documentation ‘touching the claim’ in litigation in the Court of Claims.” The language of the section is that the Attorney General shall request the department to furnish him “all facts, circumstances, and evidence touching the claim in the possession” of the department, and that such department “shall * * * furnish the Attorney General with a full statement, in writing, * * * [which] shall contain a reference to or description of all such official docu *850 ments or papers * * * as may * * * be necessary and proper for tbe defense of the United States * *
In view of the language of section 91, there would be no contravention of the statute if the department furnished, and the Attorney General accepted, a statement containing a description of documents withheld by the department, without a disclosure of their contents.
The waiver doctrine of Fireman’s Fwnd is not, therefore, inconsistent with either section 91 or section 306 of title 5. The extent of its holding is that, when action by the head of a department in withholding documents is justified, the withholding “is as applicable to government counsel as to others”; and if the Government withholds from the claimant, while delivering the documents to its own counsel, the privileged and confidential status of the documents is lost as a consequence of the delivery to Government counsel.
A simpler, more direct application of “what is sauce for the goose is sauce for the gander” would be hard to imagine. Under the doctrine of Fireman’s Fwnd, the Government department has an option: it can avoid the waiver of privilege by withholding from the trial attorneys assigned by the Attorney General access to and knowledge of the contents of the documents. Such withholding could and should be made with the knowledge and consent of the Attorney General. In practical application, the exercise of the option would mean only that the department would have to do its own screening. It could not deliver its files in bulk to the trial attorneys in the Department of Justice.
Defendant’s brief asserts inability of trial counsel to defend against a challenge of the claim of privilege unless defending counsel have the documents for examination. In view of the extensive discussion of the instant claim of privilege by one who has not seen the documents in question, the purported handicap of defense counsel contains an element of non segtuiiur. If the principle of Fireman’s Fwnd is sound, as the writer believes it to be, the Government’s chief law office can adjust to it as well as do the courts in the discharge of their functions, and in much the same maimer.
*851 Once the head of a department avoids waiver of the privilege in the manner suggested, there would be no obstacle to his assertion of the claim of privilege in normal course. If the claim of privilege should then be challenged, the challenge would be for consideration as in Bank Line, supra.
Bank Line had filed two libels against the United States to recover damages to one of its vessels arising out of a collision which occurred in the channel leading into Casablanca in 1944. Several vessels, traveling in convoy in thick weather, were involved in the mishap. Contending that the truth about the collision would have to be ascertained by combining the observations of the different vessels, the libellant sought disclosure of the facts developed at an investigation by a Naval Board, convened pursuant to Navy Regulations. The libellant moved in the District Court for an order directing the United States to produce, among other items, a transcript of the hearing before the Naval Board.
The Navy objected to the granting of the motion on the ground that the investigation was held solely for naval purposes and because of a possible need for disciplinary action respecting the conduct of commanding officers of certain of the escort vessels. The trial court nevertheless granted the motion, except as to such portions of the record before the Board as dealt solely with disciplinary action. Thereafter the United States moved for a reconsideration of the matter and a vacation of the order, submitting a written statement by the Judge Advocate of the Navy that the record of the Board of Investigation was privileged. The Judge Advocate further represented to the court that:
The situation is of very considerable concern to the Navy Department. It presents the issue of whether its investigatory and fact-finding procedure, upon which possible deficiencies in the naval service may be reviewed and corrected, becomes a public record and. available to any litigant who joins the United States in a proceeding. If the investigatory procedure has no privileged status, then the administration of the Navy Department will be seriously hampered. Further these proceedings often involve disciplinary matters and aspects beyond civil litigation become publicized to the detriment of individuals involved. In the particular instance the issue is *852 whether a foreign, shipowner is to have full access to the records of an investigation which was made into a war activity, the administration of the channel approach leading to Casablanca, as a result of which administrative changes in operation were effected. * * *
The libellant made an affidavit that it had vainly endeavored to obtain statements from the other vessels involved in the collision and that it was necessary in order to ascertain the facts to learn the identity of the witnesses, and that the record of the investigation at Casablanca was the only means by which it could secure the required evidence and properly prepare its case for trial.[34]
After the District Court denied the motion for vacation of its former order, the United States filed a petition in the Second Circuit Court of Appeals for writs of prohibition and mandamus to prevent enforcement of the order by the District Court. In support of the petition there was filed the following communication from the Acting Secretary of the Navy to the Attorney General :
After full consideration of the opinion of the District Court and its effect upon Navy Department procedure, the Navy Department reiterates the considerations set forth in the Judge Advocate General’s communication of 9 May 1946. The Navy Department is of the view that an inability to conduct an investigatory proceeding into its own administration, without the record becoming-available to litigants, if the matter should become involved in litigation, will greatly hamper the effective functioning of the Navy Department and is prejudicial to its best interests. For that reason, the Navy Department considers the compulsory production of records of its investigations prejudicial to the Navy Department and, therefore, not in the public interest.
The Court of Appeals noted that the “libellant has moved for the production of the record pursuant to Supreme Court Admiralty Rule 32, * * and that “[T]his rule was copied from Rule 34 of the Federal Rules of Civil Procedure * * *, which has been construed as giving broad scope to inquiries to aid in the preparation for trial and embraces situations *853 where the documents sought ‘contain evidence material to any matter involved in the action.’ ” The court added: “The right of discovery under this rule is not restricted to documents which are competent as evidence, if they contain facts which may be the source of information that would be admissible at the trial.”[35]
The Court of Appeals declined, however, to issue the extraordinary writs, on the grounds (1) that the order of the District Court was not appealable and (2) the cases were not “extraordinary causes.” Without “passing on the merits of the orders * * *,” the appellate court nevertheless suggested “considerations for the District Court in the event further steps to enforce the orders are taken.” Among the “considerations” were references to Boske v. Comingore, 177 U.S. 459; Duncan v. Cammell Laird & Co., [1942] A.C. 624; and the call statute of the Court of Claims (now 28 U.S.C. 2507). One of the judges added, in a concurring opinion:
* * * I think we should avoid any implication of a suggestion that the Navy has, as yet, shown fully adequate grounds for refusing discovery. Certainly for the conduct of war and for purposes of national defense the proper heads of our armed forces may make a decision of the need of concealment, which the courts must respect ; but I think no general principle of refusing discovery on a general statement of prejudice to its best interests can or should be applied to any branch of the government, including the armed forces. * * *
When the matter again came before the District Court, the United States persisted in its refusal to comply with the order, basing its refusal upon the authority of the Navy’s Regulation[36] promulgated pursuant to 5 U.S.C. § 22. The trial court, in renewing the order for the production of the documents, said, in pertinent part:[37]
In order to limit the scope of the pending question, as well as the decision, it may be useful to put the question in its proper category. Disclosure of papers in the possession of the government may be sought in cases in *854 which, the government is merely a witness and in cases in which it is a party. This case is of the latter variety. The government may be the party complainant or the party defendant. In this case it occupies both roles. The information to be discovered may relate to the military or diplomatic activities of the government or to what the government’s proctor calls its “housekeeping.” This case belongs in the latter classification. The government in its brief has disclaimed any considerations of military security as a reason for its unwillingness to disclose.
The ground assigned by the government is as follows:
“The Government maintains that such publicity would greatly hamper and impede orderly administration by requiring administrative agencies to adopt safeguards as to the type of evidence and inquiry permitted in its housekeeping investigation.”
It seems to me that two public interests are here in conflict. The first is that justice shall be done between litigants. The conflicting interest is that asserted by the government in the secrecy of its housekeeping records. That the latter public interest exists the courts are not privileged to question. Which policy is to prevail?
In criminal cases the choice has been left to the government. The government is given the option either to reveal all evidence within its control which bears upon the charges, or to let the offense go unpunished — at least where the evidence is held by officials who are themselves charged with the administration of those laws for whose violation the accused has been indicted. United States v. Grayson, 2 Cir., 1948, 166 F. 2d 863. Thus the party charged with the maintenance of both policies must choose between them as each opportunity presents itself.
*****
In Bowles v. Ackerman, D.C., S.D.N.Y., 1945, 4 F.R.D. 260, Judge Bright held that the Price Administrator by instituting an action disabled himself from urging the privilege in support of his refusal to disclose evidence in hxs possession.
It seems to me but a short step, and a necessary one, from these premises to the argument that where the government is the complainant in a civil suit for damages it should likewise be required to make its own choice— to resolve on its part which of two conflicting public interests it prefers in any particular instance. The argument advanced by the government that the privilege is *855 that of the Navy Department whereas suit is prosecuted by the Department of Justice for the benefit of the Treasury Department, and that the Navy Department, not exercising any discretion as to institution of litigation cannot be deemed to have waived its privilege, has already been frowned upon in United States v. Grayson, supra. The several departments are all agencies of one government, possessed, theoretically, at least, of a single will. When that will is exercised in favor of litigating its claims it is thereby exercised in favor of surrendering the conditional privilege of suppressing its housekeeping secrets when these are useful in the ascertainment of liability.
It is a somewhat longer step to the conclusion that the privilege is surrendered when the government is a party defendant. The government cannot be made a party defendant without its consent; and I assume that the government could have annexed to its consent an absolute privilege of non-disclosure of information in its possession. To the extent that it would have made the assertion of some claims against the government futile, it would amount to a constriction of the scope of the government’s consent. _
_ Congress has not here so circumscribed its consent to be sued. 46 U.S.C.A. §§ 741, 742, 743, 781, 782. On the contrary, § 743 directs that the principles of law and the rules of practice obtaining between private parties shall prevail. The consent, being general, amounts to an endorsement of the libel with the sovereign’s command “Soit droit fait al partie”. (Let right be done to the party.) But right cannot be done if the government is allowed to suppress the facts in its possession.
Perhaps there is an area of military and diplomatic secrets where the national interest must prevail even at the expense of private justice. Such, an instance is Duncan v. Cammell, Laird & Co. [1942] A.C. 624, which incidentally, did not involve the sovereign as a party. Only one case, Walling v. Comet Carriers, Inc., D.C., S.D.N.Y., 1944, 3 F.R.D. 442, has come to my attention, where the government’s conditional privilege has been successfully asserted as a bar to disclosure of relevant evidence in its possession where the government, by its consent or initiative, was party to the litigation and the evidence did not involve military or diplomatic secrets. Other cases have rejected the privilege in such a situation.
*856 I conclude that no adequate cause has been shown why the order of the district court should not be complied with.
What consequences shall be attached to the government’s failure to comply ? Bule 32C provides a considerable choice. I think the order should not be coercive, but, as carefully as possible, do no more than remove the inequality which the refusal has created. That, I think, will be accomplished by an order prohibiting the government from introducing evidence relating to the issue of the side of the channel on which the collision occurred, unless within twenty days it complies with the previous order of the district court. If I have miscalculated and the relief appears either excessive or inadequate, I shall hear counsel on the settlement of the order on five days’ notice.
Defendant here asserts that plaintiff’s “reliance in Bank Line * * * on a statutory waiver of privilege in admiralty cases is misplaced * * Its reasons follow:
In the Kaiser Aluminum opinion this Court connects executive privilege with the waiver of sovereign immunity. See 141 C. Cls. at p. 46. This is also true in United States v. Reynolds, 345 U.S. 1, 12 (1953). A case strongly relied upon by plaintiff is Bank Line, Ltd. v. United States, 76 F. Supp. 801 (S.D.N.Y. 1948). * * * This case is * * * an admiralty case and at page 804 of the opinion the Court points out with respect to the waiver of sovereign immunity in admiralty: “Congress has not here so circumscribed its consent to be sued, 46 U.S.C.A. §§ 741, 742, 743, 781, and 782. On the contrary, § 743 directs that the principles of law and the rules of practice obtaining between private parties shall prevail.”
In contrast, the limited jurisdictional statute for litigation in this Court has no statement that “suits shall e heard and determined according to the principles of law and rules of practice obtaining in like cases between private parties,” 46 U.S.C. § 743, and in fact in the Kaiser opinion it is stated that “Executive privilege is a phase of release from requirements common to private citizens or organizations.” 141 C. Cls. at p. 46.
It would, however, seem clear that a mere statutory enactment cannot override a power in the Executive which is inherent under the Constitution.
Thus President Eisenhower, in signing the 1958 Amendment to R.S. 161 (5 U.S.C. 22), stated: “In its *857 consideration of this legislation the Congress has recognized that the decision-making and investigative processes must be protected. It is also clear from the legislative history of the bill that it is not intended to, and indeed could not, alter the existing power of the head of an Executive department to keep appropriate information or papers confidential in the public interest. This power in the Executive Branch is inherent under the Constitution.
Defendant would thus avoid the application of Bank Line to the instant case on the grounds: (1) that Bank Line was an admiralty case; (2) that the statute waiving the sovereign immunity, under which the suit was filed, provided that “suits shall be heard and determined according to the principles of law and rules of practice obtaining in like cases between private parties”; and (3) that, in any event, the claim of privilege here asserted is inherent in the separation of powers under the Constitution.
No reason has been suggested for differentiating between admiralty and common law in the disposition of the procedural question here involved. Admiralty Eule 32, providing for discovery through the production of documents, was copied from Federal Eule 34. While there are minor differences in the texts of the two rules (as is also true of Federal Eule 34 and Eule 26 of this court), no point has been made of them. From the standpoint of rules of procedure, the problem is merely one of application. The principles determinative of such application are the same in admiralty and common law.
The Suits in Admiralty Act[38] contains the provision that “suits shall be heard and determined according to the principles of law and rules of procedure obtaining in like cases between private parties.”[39]
Similarly, the Federal Tort Claims Act[40] vests jurisdiction in the district courts of tort actions for damages caused by the negligence of Government employees “under circumstances where the United States, if a private person, would be *858 liable to the claimant in accordance with, the law of the place where the act or omission occurred,”[41] and provides that “[T]he United States shall be liable, respecting * * * tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.” [42]
In its original form, the Federal Tort Claims Act further provided that “* * * the forms of process, writs, pleadings, and motions, and the practice and procedure, shall be in accordance with the rules promulgated by the Supreme Court * * *,” [43] referring to the Federal Rules of Civil Procedure. This provision was dropped in the codification of 1948, as was another, general provision, that “[T]he course of procedure for the district courts and the Court of Claims * * * and the procedure prescribed by the Court of Claims shall be in accordance with the established rules of said respective courts, and of such additions and modifications thereof as said courts may adopt.” [44]
The Tucker Act[45] gave the Court of Claims jurisdiction “to hear and determine” specified categories of claims against the United States, and vested in the district courts concurrent jurisdiction in such cases “where the amount of the claim does not exceed one thousand dollars.” It qualified the categories for waiver of sovereign immunity as being claims in which “the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable.” [46] The act further provided that “the jurisdiction of the respective courts of the United States proceeding under this act * * * shall be governed by the law now in force * * *; and the course of procedure shall be in accordance with the established rules of said respective courts, and of such additions and modifications thereof as said courts may adopt.”[47]
Defendant’s contention that the provisions in the Suits in Admiralty Act and the Federal Tort Claims Act (whereby *859 sovereign immunity is waived in favor of tbe “principles of law and tbe rules of practice obtaining between private parties shall prevail”) set those two statutes apart from the Tucker Act is unimpressive, insofar as defendant seeks thereby to read into the Tucker Act a limitation upon the waiver of sovereign immunity in relation to the application of discovery processes.[48]
The Judicial Code provides:[49]
The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court.
The Court of Claims adopted its Rule 26 pursuant to that authority. Our Rule 26 was copied from Rule 34 of the Federal Rules of Civil Procedure, and the Federal Rules were prescribed by the Supreme Court.
In Benson v. United States, supra, this court noted that:[50]
Both the House and Senate reports accompanying H.R. 9730, 83d Congress, which became Public Law 779,[51] contained the following:
“The purpose of proposed subsection (b) of section 2507 of title 28 is to eliminate the argument that the only means by which a litigant in the Court of Claims can obtain papers in the custody of Government departments is through a call, and to make it clear that in the enactment of section 2071, title 28, United States Code, Congress intended that the Court of Claims could issue rules, which give to all litigants, private citizens and the Government alike, the same rights of pretrial discovery as is accorded to them in suits brought in the District Courts pursuant to section 1346, title 28, United States Code.”
Section 1346 of title 28 provides, in subsection (a), for jurisdiction in the district courts, concurrent with the Court of Claims, of Tucker Act claims up to $10,000 and of tax claims without restriction as to amount; and in subsection *860 (b), for jurisdiction in tbe district courts of tort claims based on the negligence of Government employees “under circumstances where the United States, if a private person, would be liable * *
This court held, in Benson:[52]
* * * if this court is to have a rule which gives to all litigants in this court, plaintiffs as well as defendant, the same rights of pretrial discovery as is accorded to them in suits brought in the district courts pursuant to section 1346, the words “not privileged” in our Eule 26 must be given the same meaning as the same words in the Federal Eule. As used in Eule 34 of the Federal Eules, the words “not privileged” relate to privilege as known and understood in the law of evidence. It follows that defendant’s claims of privilege in this proceeding should be tested accordingly.
Defendant’s contention of governmental immunity from discovery is predicated on the general immunity of the sovereign from suit except upon terms to which it has consented. Neither the existence nor the validity of the general principle of sovereign immunity has been questioned in this proceeding. What is in issue is the sovereign’s consent to suit upon terms which include the processes of discovery. All of the precedents, with one exception,[53] proceed upon the basis of such consent having been given.
Because these precedents stem from one or another of the bases of governmental amenity to judicial process other than the Tucker Act — proprietary suits, enforcement proceedings, criminal prosecutions, the Federal Tort Claims Act, or the Suits in Admiralty Act — defendant’s contention of immunity from discovery is narrowed to the claim that the sovereign’s consent to be sued, as expressed in the Tucker Act, was conditioned upon such immunity. Nothing has been cited from the history, content, or application of the Tucker Act to support such a differentiation.
It is quite true that there is a paucity of precedents relating the discovery processes to suits under the Tucker Act. The reason is obvious. The jurisdiction of the district courts in Tucker Act cases is limited by the $10,000 *861 ceiling. The great volume of Tucker Act litigation is therefore in this court, where only two cases on this procedural point have been decided: Benson, supra, and Kaiser, supra.
Moore’s Federal Practice[54] has this to say:
* * * The conclusion stated in the first edition of this Treatise, at a time when there were no decisions on the point, is sound: “inspection of government documents should be permitted,” in a suit to which the United States * * * is a party, “unless the court is satisfied that it would be against public policy to do so.” Although the Government’s claim of privilege is entitled to respectful consideration * * *, the determination of that privilege is for the court, not the Government, in an action in which the Government is a litigant.
Moore also notes the relation of the separation-of-powers doctrine to the privilege question:[55]
* * * confining ourselves to the narrow question as to whether the Government, as a litigant, may itself determine its claim, the answer is tolerably clear that it may not do so. The separation-of-powers doctrine and the very nature of the judicial process so dictate. Note that the district court did not compel the Government to disclose its information, claimed by it to be secret and confidential; nor punish its lawyers for contempt. It carefully avoided making a decision that invaded the executive area. Within that area the executive’s determination that certain of its records are not subject to disclosure is final. But where the Government is a litigant, * * * then the question of disclosure, as it relates to the litigation, is within the judicial area.
Conceivably, nevertheless, the governmental claim of privilege might be regarded as posing a political question, upon which the court must accept the executive determination as final, and proceed, without requiring disclosure, to an adjudication of the non-political issues. But certainly as a general proposition where the Government is a litigant, neither the executive nor the legislature may dictate to the judiciary what determination shall be made. In this field the judiciary must be supreme and its determination binding in matters judicial * * *. * * * And * * * it is an im *862 proper invasion of tbe judicial area for tbe Government, as a litigant, to have the right to determine an important issue in the case, such as disclosure * * *.
Toward the end of his test the author observes that “[T]he considerations set out in the preceding discussion are applicable also in litigation to which the United States is a party but which does not involve the Government’s regulatory powers — e.g., actions under the Tort Claims Act or the Suits in Admiralty Act.”[56] He then adds:[57]
Here, however, the presumption is stronger that the private party should have the full benefit of the discovery procedure, and any claim of “government privilege” should be scrutinized, with perhaps even greater skepticism.
The foregoing observation is followed, in the text, by an extensive analysis of Bank Line, supra.
The writer’s conclusions, with respect to the contentions whereby defendant would avoid the reasoning of the Bank Line decision, are:
(1) That the distinction between admiralty and common law jurisdiction is of no consequence in relation to the procedural point at issue;
(2) That the statutory specification, in the Suits in Admiralty Act, for application of “the principles of law and rules of practice obtaining in like cases between private parties” is not fundamentally different from the waiver of sovereign immunity in the Tucker Act over claims in which “the party would be entitled to redress against the United States * * * if the United States were suable.” Rather than distinguish actions under the Suits in Admiralty Act and the Tort Claims Act from Tucker Act suits, in relation to the question here at issue, there seems to be an affinity between all such actions in the terms stated by Professor Moore: “* * * the presumption is stronger that the private party should have the full benefit of the discovery procedure, and any claim of ‘government privilege’ should be scrutinized, with perhaps even greater skepticism” than in the regulatory proceedings.
*863 (3) That no constitutional issue is involved in the instant consideration, unless it be the issue injected by defendant based on the separation of powers; and in that event the issue rests, not upon any possible invasion of executive powers by the judiciary if plaintiff should be awarded the relief sought by him, but upon the attempted invasion of judicial powers by the executive through the assertion of the executive’s absolute immunity from the judicial process of discovery.
From the foregoing analysis it follows that the two admiralty cases, Fireman's Firnd and Bank Line, are entitled to as much consideration as precedents in the instant case as are the decisions in the regulatory and enforcement proceedings.
Considered together these two cases support the proposition that, as a measure for balancing the rights of the parties in adversary litigation, the claim of privilege should be denied when recognition of it would deprive the claimant of access to a substantial and relevant portion of the record that is known to his adversary. The persuasiveness of such a rationale is apparent.
Relating the discussion back, therefore, to the summary at the conclusion of the preceding section of this opinion, and confining attention to the claim of executive privilege based on public interest, as that claim has been asserted and delineated by the Acting Secretary of the Army, and as such claim relates either to the support of plaintiff’s affirmative claims or to his defense against defendant’s counterclaims, plaintiff’s motion for an order disallowing the claim of privilege and requiring production of the documents on pain of sanctions under Rule 36(b) (ii) should be granted with modifications.
Defendant should be given its election: (1) to produce the documents for inspection by plaintiff, as directed by the initial order and in conformity with Rule 26(a); or (2) to produce the documents for examination by the commissioner, with the right to urge before him, prior to the disclosure of the contents thereof to the plaintiff, reasons which might warrant the classification of individual documents as privileged (such as, for example, a document relating solely to intra- *864 office advice on policy, within the narrow principle oí Kaiser); or (3) accept such sanctions under Eule 36(b) (ii) as may be appropriately imposed.
VI
One of the two categories of documents withheld was described by the Acting Secretary of the Army as—
* * * the work product of attorneys in the Department of the Army, for example, those reports developed for use in the various litigation matters concerning the Gov-enrment and plaintiff; * * *.
“The starting point in any discussion of the work product of a lawyer should be the case of Hickman v. Taylor, 329 U.S. 495 * * *”[58] decided in 1947. The phrase “work product of the lawyer” originated in the argument of that case before the Court of Appeals for the Third Circuit.[59]
Hickman v. Taylor was a suit under the Jones Act by the widow of a seaman who was drowned in the capsizing of a tug. Among the interrogatories filed by plaintiff was one which read:[60]
State whether or not any statements of the members of the crew * * * were taken * * *. Attach hereto exact copies of all such statements if in writing, and if oral, set forth in detail the exact provisions of any such oral statements or reports.
Statements of the surviving members of the crew had been taken by Mr. Fortenbaugh, an attorney representing defendants. The statements were taken before suit was filed, but after the claim arose.
The district court, in ordering the discovery, made no distinction between signed statements and memoranda of counsel of statements of fact made to him, except in its direction that, if Mr. Fortenbaugh’s memoranda contained notations of mental impressions, opinions, legal theories, or other collateral matter, they should be submitted to the court, which would direct disclosure of those portions of the memoranda containing statements of fact obtained from witnesses which it considered to be within the proper scope of discovery.
*865 Defendants and Fortenbaugh refused to comply with the order and were adjudged guilty of criminal contempt. The court of appeals reversed, and the Supreme Court granted certiorari.
The Supreme Court first reviewed the procedure to determine which of the Rules of Procedure were involved: Pule 26, permitting depositions pending action; Rule 33, permitting interrogatories; or Rule 34, permitting discovery through the production of documents. It concluded “that petitioner was proceeding primarily under Rule 33,” [61] since no depositions had been sought, and since there was no motion for production under Rule 34. The court found the procedural irregularity to be of no moment, however, since “the deposition-discovery rules create integrated procedural devices.”[62]
* * * And the basic question at stake is whether any of those devices may be used to inquire into materials collected by an adverse party’s counsel in the course of preparation for possible litigation. * * *[63]
Other portions of the opinion follow:[64]
* * * We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of “fishing expedition” serve to preclude a party from inquiring into the facts underlying his opponent’s case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. * * * The deposition-discovery procedure simply advances the stage at which disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise. But discovery, like all matters of procedure, has ultimate and necessary 'boundaries. * * *
* * * We also agree that the memoranda, statements and mental impressions in issue in this case fall outside the scope of the attorney-client privilege and hence are not protected from discovery on that basis. * * * [T]he protective cloak of this privilege does not extend to information which an attorney secures from a witness while acting for his client in anticipation of litigation. Nor does this privilege concern the memoranda, briefs, com *866 munications and other writings prepared by counsel for his own use in prosecuting his client’s case; and it is equally unrelated to writings which reflect an attorney’s mental impressions, conclusions, opinions, or legal theories.
But the impropriety of invoking that privilege does not provide an answer to the problem before us. Petitioner has made more than an ordinary request for relevant, non-privileged facts in the possession of his adversaries or their counsel. He has sought discovery as of right of oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired. He has sought production of these matters after making the most searching inquiries of his opponents * * * which inquiries were sworn to have been answered to the best of their information and belief. * * * Full and honest answers to such broad inquiries would necessarily have included all pertinent information gleaned by Fortenbaugh through his interviews with the witnesses. Petitioner makes no suggestion, and we cannot assume, that the tug owners or Fortenbaugh were incomplete or dishonest in the framing of their answers. We are thus dealing with an attempt to secure the production of written statements and mental impressions contained in the files and mind of the attorney Fortenbaugh without any showing of necessity or any indication or claim that denial of such production would u/nduly prejudice the preparation of petitioner’s case or cause him any hardship or injustice. For aught that appears, the essence of what petitioner seeks either has been revealed to bim already * * * or is readily available to him direct from the witnesses for the asking. [Emphasis supplied.]
_ The District Court, after hearing objections to petitioner’s request, commanded Fortenbaugh to produce all written statements of witnesses and to state in substance any facts learned through oral statements of witnesses to him. Fortenbaugh was to submit any memo-randa he had made of the oral statements so that the court might determine what portions should be revealed to petitioner. All of this was ordered without any showing hy petitioner, or any requirement that he malee a proper showing, of the necessity for the production of any of this. material or any demonstration that denial of production would cause hardship or injustice. The court simply ordered production on the theory that the facts sought were material and were not privileged as constituting attorney-client communications. [Emphasis supplied.]
*867 In our opinion, neither Rule 2'6 nor any other rule dealing with discovery contemplates production under such circumstances. That is not because the subject matter is privileged or irrelevant, as those concepts are used in these rules. Here is simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party’s counsel in the course of his legal duties. As such it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the the mental impressions of an attorney. * * * [Emphasis supplied.]
In a concurring opinion, Mr. Justice Jackson said:[65]
* * * I can conceive of no practice more demoralizing to the Bar than to require a lawyer to write out and deliver to his adversary an account of what witnesses have told him. Even if his recollection were perfect, the statement would be his language, permeated with his inferences. * * *
The question remains as to signed statements or those written by witnesses. * * * There might be circumstances * * * where impossibility or difficulty of access to the witness or his refusal to respond to requests for information or other facts would show that the interests of justice require that such statements be made available. Production of such statements are governed by Rule 34 and on “showing good cause therefor” the court may order their inspection, copying or photographing. No such application has here been made; the demand is made on the basis of right, not on showing of cause.
The doctrine of Hickman v. Taylor has been invoked in the instant proceeding by the Acting Secretary’s use of the phrase “work product of attorneys.” Except for the cited “example” of “those reports developed for use in the various litigation matters concerning the Government and plaintiff,” the court has not been informed of the nature or content of the documents withheld.
It is clear that the Acting Secretary has not invoked the attorney-client privilege. Pie might have done so; but he did not do so. If, in the light of later developments, it ap *868 pears that he has misconceived his remedy, in that some or all of the documents withheld as the work product of attorneys are rightfully privileged through the attorney-client relationship, he may, of course, be heard. At this point in the proceeding, however, the attorney-client privilege is not in issue.
What is in issue, as “the work product of attorneys,” represents a category of exclusion which “falls outside the arena of discovery” because it “contravenes the public policy underlying the orderly prosecution and defense of legal claims,” and “not because the subject matter is privileged.” The category was unknown when the Federal Rules of Civil Procedure were adopted. It could not, therefore, be privileged within the meaning of “privilege” as used in the Rules. It represents, instead, a product of recent judge-made law.[66]
In the one and only instance of its application by the court which gave it form, the exclusion was applied to “written statements, private memoranda and personal recollections prepared or formed by an adverse party’s counsel in the course of his legal duties” while preparing for trial; and the exclusion was predicated on petitioner’s demand for the work product as a matter of right, and “without purported necessity or justification.”
In the instant case, plaintiff, proceeding under our Rule 26, made a showing of good cause for the initial issuance of the order to produce. At that time and since, he has averred that denial of production would cause hardship to him and might result in injustice, and that the information contained in the documents is not otherwise available to him. Such showing and averments are sufficient, of themselves, to warrant inquiry into the nature and content of the documents withheld, in order that the court may determine whether affirmance of the order to produce would “contravene the public policy underlying the orderly prosecution and defense of legal claims.”
As the record now stands the court is uninformed:
(1) Whether all, or some, or any of the documents withheld as the work product of attorneys represent material assembled in preparation for trial; or
*869 (2) Whether all, or some, or any of the documents so withheld were prepared during the course of dealings between Utility and the Army and before the claim arose; or
(3) Whether any of the documents represent (a) written statements of witnesses (and, if so, whether prepared by the witness or signed by him or recorded by the attorney from his own recollection) ; or (b) private memoranda; or (c) personal observations and recollection; or (d) analyses of legal theories; or (e) recommendations to superior officers.
The Acting Secretary’s characterization of documents withheld as “the work product of attorneys” represents a conclusion of law unsupported by facts. His “example” of “reports developed for use in various litigation matters concerning the Government and plaintiff” is illustrative only; and even as an illustration the description is inadequate for the needs of the court.
The essence of Hickman v. Taylor is elusive. Professor Moore devoted 30 pages to an analysis of the case in 1950,[67] only 3 years after the Supreme Court’s decision. Further developments during the intervening decade have been extensive.[68] Like the famous Kule in Shelley’s Case, which generations of learned judges and legal scholars vainly endeavored to put into a nutshell, only to have it break out again on each new set of facts, the application of Hickman v. Taylor depends upon the facts of each case, including the necessity for the discovery.
*870 In Park & Tilford Distillers Corporation v. United States, 20 F.R.D. 404 (SJD.N.Y. 1957), the court dealt specifically with “the question whether such papers as internal correspondence, memoranda and documents of a government agency are necessarily privileged against discovery because government attorneys were instrumental in preparing some or all of them,” and ordered the documents produced. In doing so the court relied on (1) a paragraph from the opinion in Hickman v. Taylor[69] and (2) a passage from Moore’s Federal Practice,[70] both of which are set forth below:
We do not mean to say that all written materials obtained or prepared by an adversary’s counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney’s file and where production of those facts is essential to the preparation of one’s case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty. Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning. But the general policy against invading the privacy of an attorney’s course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order.
[Ijnspection of government documents should be permitted, in a suit to which the United States or an officer or agency thereof is a party, unless the court is satisfied that it would be against public policy to do so. Although the Government’s claim of privilege is entitled to respectful consideration, as outlined above, the determination of that privilege is for the court, not *871 the Government, in an action in which the Government is a litigant.
Statements by counsel, for both plaintiff and defendant, in their briefs on the work-product claim of exclusion warrant the surmise (if not the inference) that some of the documents in this category represent advisory opinions by members of the legal staff to the Judge Advocate General. The possibility has been noted, heretofore, that such work-product documents might fall within the executive privilege as defined by this court in Kaiser. If such be the case, some of the work-product documents may warrant consideration for exclusion because of executive privilege, although failing to qualify for exclusion as contravening the public policy defined in Hickman v. Taylor. The court, however, cannot know until the facts are developed, wherefore further conjecture would be useless.
It follows that, under the circumstances, and on the record as it now stands, the claim of exclusion based on the work product of attorneys should be rejected outright unless the Government chooses to identify the documents severally, in sufficient detail for the court to make an enlightened determination with respect to each one.
VII
Plaintiff asserts that issues of fraud are expressly raised by the pleadings; that those issues pertain to plaintiff’s claims and are specifically directed to defendant’s counterclaims as well; that on the basis of facts established by documents so far disclosed,[71] the charges of fraud raise grave and substantial issues of fact; and that the issues of fraud vitiate defendant’s claims of privilege, whether based on grounds of public interest or the work product of attorneys.
The essence of plaintiff’s charge of fraud, as heretofore noted, is that the Army wantonly and fraudulently forced Utility into bankruptcy in pursuit of a contrived default *872 termination of Utility’s production contracts as a means of avoiding the Department’s obligations under a termination for convenience of the Government, because the latter type of termination would have required a termination settlement.
The first requisite of analysis of the fraud issue as raised by plaintiff is perspective.
Plaintiff does, as noted by defendant, employ “a considerable array of words * * such as spurious, demonstrably false, malicious, shameful, cynical, devious, outright chicanery, inherently weird, et cetera.
Defendant “denies each and every allegation of misconduct made by plaintiff.” Appended to defendant’s brief are the affidavits of (1) Karl IÍ. Bendetsen, Assistant Secretary of the Army and Under Secretary of the Army from February 2,1950, to October 3, 1952; (2) Harold L. Pearson, Deputy Under Secretary of the Army from April 29,1952, to February 10, 1954; and (8) Colonel A. T. Stanwix-Hay, Deputy Chief, Procurement and Distribution Division, Office of the Chief Signal Officer, as of December 24, 1959.
Each of the civilian officials has stated under oath that in all of his actions with respect to Utility he exercised his best judgment, that he acted in good faith and with honest intent, and that plaintiff’s characterizations of such actions as false or fraudulent are untruthful.
The commissioned officer (who was Deputy Chief of Procurement when defendant responded to plaintiff’s motion) has directed his affidavit to a production chart covering the manufacture of portable radios by all producers so engaged during the period from June 1952 through June 1953. Affi-ant states that “based on information relative to requirements for these items available * * * within the Army it is my opinion that during the period covered by the * * * chart the production of these items by sources other than Utility * * * was sufficient to satisfy the requirements for those items.”
All three of the affidavits may be accepted at face value, for the purposes of this analysis. The evidence at hand is insufficient to establish, even prima facie, the existence of conscious wrongful intent on the part of the civilian officials, and plaintiff has not specifically challenged the commissioned *873 officer’s judgment that alternative sources of supply were available during the last half of 1952.
If fraud, within the contest of this proceeding, is limited by the Supreme Court’s characterization of the term in United States v. Wunderlich, 342 U.S. 98, 100 (1951) as “conscious wrongdoing, an intention to cheat or be dishonest,” and if there was such fraud in the Signal Corps’ administration of Utility’s contracts, the civilian officials of the Department who are affiants here have not been shown to have been parties to it.
The foregoing observation is limited (1) to the affiants and (2) to conscious wrongdoing accompanied by an intention to cheat or be dishonest. Opinion is reserved (a) as to whether or not subordinate civilian officials or commissioned officers may have engaged in such conscious wrongdoing and (b) as to whether or not the affiants themselves, on the facts and record before them, can be absolved of the charge that they reasonably should have known that wrongful results would flow from their actions.
Objective analysis of the evidence now available reveals that, as between plaintiff’s black and defendant’s white, there are some areas of unmistakable gray.
Insofar as it may appear that Utility, before Korea, had undertaken a volume of production contracts disproportionate to its capital structure and lines of credit, it also appears that the Signal Corps, in awarding those contracts, was satisfied with Utility’s ability to perform.
After Korea, Utility unquestionably faced prohibitive losses. This situation was not the fault of either Utility or the Government. The Government financing which followed was, as plaintiff contends, for the convenience of the Government based on military necessity.
Because (a) Utility was considered a competent contractor, (b) the items under contract were urgently needed, and (c) no other source was readily available, the Army stepped in to assist Utility with the financing requisite to continued production. Under overall Department of Defense policy, such financing was authorized on the basis of the two-pronged finding of essentiality, and the officials responsible for it were told that—
*874 In terms of organization, the financing function should be separated from the procurement function, but close cooperation between the procurement and financing functions should be preserved at all times.
The V-Loan of November 1950 saved Utility from bankruptcy. Also (as emphasized by defendant) it obviated the necessity for developing an uncollectible claim of $5 million against Utility for excess costs in the reprocurement of Utility’s contracts.
Assistant Secretary Bendetsen, whose main area of responsibility concerned the financial activities of the Department of the Army, was reluctant to approve the 100 percent guarantee of a loan of $3 million to a corporation having a net worth of only $114,000 (being 3.8 percent of the face of the loan). He gave his approval only upon “the affirmative recommendation” of his administrative superior, the Under Secretary of the Army (Mr. Archibald Alexander), who was in charge of procurement.
While the function of finance was separate from the function of procurement, Secretary Bendetsen’s reluctant approval preserved the close cooperation between the procurement and financing functions. In this instance, finance cooperated with procurement.
Six months later, in May 1951, Utility was again in dire financial straits. According to Secretary Bendetsen’s affidavit, Utility was unable to meet its payroll and was indebted to trade creditors in a substantial amount. He further states: (1) that “[A]s it was apparently possible that bankruptcy might occur at any time,” he directed the Army to purchase the guaranteed loan “to protect its interests”; and (2) that “he also directed that an advance payment plan be considered to secure to the Government the inventory purchased by the company under the Signal Corps contracts.”
In these actions, taken on or about May 28,1951, the finance function appears to have been paramount. Certainly, Secretary Bendetsen was cognizant of the Army policy that financing was to be so administered as to minimize the risk of monetary loss to the Government to the extent compatible with essential procurement.
A short time later, in June 1951, procurement officials presented to Secretary Bendetsen a plan for additional *875 financing of Utility by means of an advance payment fund of $1.5 million. The Assistant Secretary “found no basis upon which to approve” the plan, “in that, while the procurement officials certified that the equipment manufactured by Utility was essential, they did not show how Utility could produce the equipment within the $1,500,000 financing limit.” He had understood, in the fall of 1950, that the $3 million V-Loan was intended to be sufficient financing to produce the goods.
Evidently, procurement kept pressuring finance, for Secretary Bendetsen ultimately approved the advance payment plan as an operating device, although he says he approved the $1 million advance payment “to carry the company until action by the Contract Adjustment Board on a pending application by the company” for hardship relief. At the same time, the Secretary “directed that action be taken, in view of the company’s financial condition, to explore the possibility of placing [the walkie-talkie contract] with another source, pointing out that more than eighteen months had been spent in reliance for delivery of vital combat items from a questionable source and but little or no time in placing combat needs with a strong supplier.”
As of June 1951, finance was continuing to cooperate with procurement, because of procurement’s insistent representations of the essentiality of Utility’s production. In doing so, however, finance underscored its misgivings by a demand that search be made for an alternate supplier.
In August 1951, procurement gave consideration, for the first time, to terminating one or more of Utility’s contracts for the convenience of the Government, but took no action.
In October 1951, the Army Contract Adjustment Board authorized hardship relief to Utility in the amount of $1.9 million. The Board’s action was founded on the requisite two-pronged finding of essentiality, urgent need of the equipment and unavailability of alternate suppliers. These findings, made 4 months after the Advance Payment Agreement, reinforced proctirement’s policy of continuing Utility’s production.
In January 1952, Secretary Bendetsen again reviewed Utility’s situation. He found the contractor to be indebted *876 to the Government, on the V-Loan and the Advance Payment Agreement, for more than $2 million, in spite of the hardship relief of $1.9 million. Upon the failure of Utility to give definite assurance that it would be able to liquidate this indebtedness upon completion of its contracts, he “deemed” the security given under the Advance Payment Agreement to be inadequate, and laid down four requirements for the furnishing of additional security. (The major requirement, personal guarantee by Utility’s stockholders of the $1 million advance payment, was never fulfilled.) He further directed that liquidation of the advance payment should be carried out at the earliest practicable date.
Whereas, from October 1950 through December 1951, the cooperation between the procurement and finance functions was marked by finance doing most of the cooperating, however reluctantly, January 1952 marked the beginning of the reversal of their roles. Thereafter, procurement did most of the cooperating.
In April 1952, procurement agreed that additional business could not be considered for Utility until such time as the company’s financial position was considered to be satisfactory, and acceded to Signal Corps policy “not to attempt to keep a company in business unless it is absolutely essential.”
Procurement, with its attention riveted on deliveries without loss of time, continued its search for means whereby to continue Utility’s production. On April 24,1952, the Assistant Chief Signal Officer asked the Deputy Comptroller of the Army for reconsideration of the question of price adjustment, pointing out that since Utility was not in a position to finance new business, the only logical solution to the problem was additional relief on existing contracts by way of further readjustment of prices “to bring them in line with the prices paid to other prime contractors manufacturing similar equipment.” There is no evidence of the disposition of this request.
It was also at this time, April 1952, that a proposal was made within the Signal Corps to terminate all of Utility’s contracts for the convenience of the Government, with payment of concomitant settlement costs of $2 million. The proposal was rejected by the Assistant Chief Signal Officer in *877 favor of a termination “in a manner most advantageous to the Government.”
Meanwhile, procurement acted upon finance’s demand to broaden the base of production. In June 1951, when Secretary Bendetsen emphasized the demand, the only order outstanding for the equipment Utility was to produce was an order for walkie-talkies placed with RCA in November 1950. In June 1951, orders for a different unit were placed with Raytheon. These were followed by contracts with Admiral in July 1951, with Emerson in August 1951, with Raytheon and Sentinel in September 1951, with RCA in December 1951 and March 1952, and with Admiral in September 1952.
As of June 80, 1952, Utility owed the Government $3.2 million.
By August 1952, Utility’s deliveries of handy-talkies were nearing completion, and other suppliers, under Utility’s lead, were well advanced. In the walkie-talkie field, Utility had barely started deliveries, and RCA (as leader) and other suppliers were as well advanced as Utility. Under the circumstances, it was apparent to procurement that, although Utility’s production was still urgently needed, other sources of supply were available. The situation would no longer support both prongs of the determination of essentiality.
Without the requisite determination of essentiality, there was no authority to continue aid to Utility, through either financing or hardship relief. Procurement had to yield to finance.
Procurement affairs were the main area of responsibility of the Deputy Under Secretary of the Army, Mr. Harold L. Pearson, who was the senior administrative officer present at the briefing session of August 5, 1952, and at the “determination” session of September 12, 1952.
In connection with the September 12 meeting, the Deputy Under Secretary has stated that “in view of the company’s deficit financial condition and its defaults under the V-Loan, it was his determination to recommend that the V-Loan be called and action instituted to effect whatever collection was possible.” The Deputy Under Secretary’s administrative superior at that time, the Under Secretary of the Army, was Mr. Bendetsen, the former Assistant Secretary in charge of *878 finance. Mr. Bendetsen says in his affidavit that it was he who, “in September of 1952, * * * again deemed the security provisions of the agreement relating to advance payments to be insufficient security for the advance payment * * and that the demand for $750,000 in additional security was made accordingly. Considering the administrative rank of Messrs. Bendetsen and Pearson, it is to be presumed that Mr. Pearson’s “recommendation” concerning the Y-Loan was made to Mr. Bendetsen, who, in turn, made the determination to call the loan.
The sequence of events in September 1952, therefore, reflected full reciprocity by procurement in its cooperation with finance. Whereas procurement needs were paramount in 1950 and 1951, and finance acceded to them, once those needs had been met, if only to the extent of a potentially broader base of supply, the emphasis shifted, and finance needs became paramount. It was then up to procurement to accede, and procurement did so.
Once agreement had been reached that procurement needs had been met, and that finance needs were paramount, finance lost no time in implementing Army policy that financing should be so administered as to minimize the risk of monetary loss to the Government to the extent compatible with essential procurement.
The V-Loan was called, and suit was instituted for its collection. Countersignatures were withheld to prevent withdrawals by Utility from its bank accounts. The processing and payment of Utility’s claims for engineering price adjustments were stopped. Funds in the pipeline for payment to Utility were frozen. Additional security of the Advance Payment Agreement, to the extent of $750,000, was demanded, to be provided within 10 days, upon pain of termination for default.
On October 9,1952, Utility suspended operations and filed its petition for an arrangement in bankruptcy. In addition to its debts to the Government, it owed some $400,000 to trade creditors.
The foregoing narrative in terms of the cooperation between the finance and procurement functions of the Army suggests familiar nuances and overtones to anyone who has *879 frequent occasion to review complex courses of Government administration.
There follows a paraphrase of the summation with which defendant closed its review of the facts.[72] The paraphrase represents the writer’s analysis of the facts now of record.
Utility, by admission of both parties, and without the fault of either, faced prohibitive losses in 1950. It was kept in production for two years (from the. fall of 1950 to the fall of 1952) only by Government assistance. Such assistance was furnished by the Government for its own convenience, based on military necessity. This financing was, of course, supplied under such terms as to make the Government a secured creditor. Utility was, at all times, utterly dependent upon Government financing, and would have become bankrupt at any time upon the withdrawal of such financing.
Twice during the two years (once in August 1951 and again in April 1952) the Government considered terminating Utility’s contracts for the convenience of the Government, at the expense of requisite settlement costs. Action was withheld on both occasions. The April 1952 consideration was closed with a determination to seek a termination “in a manner most advantageous to the Government.”
Authority for Governmental financing was restricted by departmental policy requiring determinations that the materials to be supplied by the contractor were essential to the national defense and that there was no alternate supply available. Procurement and finance both adhered strictly to this policy. Finance, however, urged procurement to more vigorous action in developing alternate suppliers, and procurement responded. By September 1952, alternate suppliers were available.
With alternative suppliers available, the Army could no longer make the determination of essentiality requisite to its authority for either direct financing or hardship relief. Without assistance in one form or the other, Utility could not possibly continue in production.
At that time, however, Utility was not in default on either its deliveries or the quality of its production.
Unconcerned with this fact, finance turned to the implementation of its guiding policy that financing should be so administered as to minimize the risk of monetary losses to the Government. There was no qualification upon this objective, now that essential pro *880 curement needs bad been met. Accordingly, finance promptly initiated every indicated step for the protection of the Government as a secured creditor, thereby forcing Utility into bankruptcy at as early a date as possible.
On the day after Utility filed in bankruptcy it was served with a notice of default. Two months later its production contracts were terminated, under their own default clauses, not because of default in deliveries or quality of production, but for failure to respond to the demands of finance for additional security of the Advance Payment Agreement.
Can fraud be implied in these circumstances %
The unsecured creditors, to whom Utility owed some $400,000, and who were not necessarily in position to know of Utility’s financial plight or of the Army’s concern with its position as a secured creditor, might question the ethics of the Army’s action.
These unsecured creditors could point out that they had supplied materials to Utility in reliance upon its reputation as a competent contractor; and that that reputation was warranted by satisfactory performance in terms of quantity and quality of deliveries and by the Army’s repeated findings that Utility’s production was essential to the national defense.
Once they were apprised of Utility’s financial plight, they could point to the further facts that as early as November 1950 the Army had recognized in Utility’s situation (1) a potential loss for someone of $5 million or more and (2) the inability of Utility to absorb that loss. They could argue, accordingly, that the Army’s election to finance Utility represented a concomitant election by it to absorb so much of the loss as could not be saved through the elimination of profits and Utility’s known efficiency as a low-cost producer.
On the basis of the foregoing premises, the unsecured creditors could reasonably argue that it was unfair, under the circumstances, for the Army to use its position as a secured creditor to cast upon them the burden of total loss, in order to reduce a loss which the Army had voluntarily underwritten. The argument would gain emphasis insofar as it might appear that the Army deliberately embarked upon a course in April 1952, having as its objective the *881 scuttling of Utility as soon as alternate suppliers could be developed. Unsecured creditors who filled the breach between April and September 1952 might have felt doubly imposed upon.
Defendant has not addressed its brief to the ethics of the situation beyond the assertion that the Army’s financing of Utility was strictly a business proposition. Defendant avers that the Army acted throughout on the basis of prudent business judgment and legal rights, and that the charges of fraud must be weighed accordingly.
Inasmuch as no privity of contract has been shown as between the Army and the unsecured creditors of Utility, the charges of fraud must be considered in terms of the Army’s undertakings with Utility and their respective obligations under the several production and finance contracts.
As previously noted, the evidence does not sustain all of plaintiff’s specific charges of wrongdoing. On the contrary, the evidence warrants affirmative findings, prima facie, that neither of the two operative determinations (the determination of non-essentiality of September 12 or the determination of inadequacy in the security of the Advance Payment Agreement) was made with conscious intent to cheat or be dishonest. Both determinations reflected ultimate affirmations of conditions which had been known to exist for some time. Both represented action deferred.
Absolution of the two Secretaries of overt fraudulent intent, however, represents more of a beginning than an end to the search for an answer to the question: Can fraud be implied from the circumstances related in these transactions ?
Several facts, which the parties’ briefs have either not touched upon or have skimmed over, are for consideration. The first of these is that the Army, from the outset, had the raw power, for use at any time it might elect, to follow the course it eventually pursued. After rescuing Utility from bankruptcy in the fall of 1950, there was never a time thereafter when Utility’s bankruptcy would not have ensued upon withdrawal by the Army of its financial assistance.
A second fact is that the Army, if and when it might elect to withdraw its aid from Utility had a choice of timing: it could take such measures as eventually were taken, and force *882 Utility into bankruptcy, or it could liave withdrawn its aid and waited for nature to take its course.
Inherent in the foregoing was still another choice. Whether the Army elected to force Utility’s bankruptcy or simply to withdraw its aid and let Utility slip into bankruptcy, the Army had the raw power to wait, after Utility’s bankruptcy, until the contractor was in default on its deliveries, and then to invoke the default clauses of the production contracts for their termination.
The evidence at hand establishes that what the Army did was to continue its assistance to Utility until such time as Utility was no longer essential to its procurement, whereupon the Army unceremoniously “pulled the rug out from under” Utility, and followed this action by default terminations based, not on the contractor’s failure to deliver in quantity or quality, but upon its failure to regain its equilibrium in the rug-pulling act.
In their briefs the parties have concentrated upon the propriety or impropriety of the Army’s action in precipitating Utility’s bankruptcy and in following this action by default terminations based on Utility’s failure to meet the Army’s demand for additional security. Plaintiff says the action was false, contrived, and fraudulent. Defendant says the action was rational and legally correct.
Neither of the parties has analyzed the timing of the Army’s action in the context of cooperation between finance and procurement.
The timing of the Army’s action is patent. Finance had never been happy in the role of banker for Utility. Secretary Bendetsen initially had declined to embark upon the role until pressure was brought to bear upon him by his administrative superior, who acted in the interest of procurement.' Within less than a year after its execution, the V-Loan was in default. Secretary Bendetsen was then maneuvered into approval of the Advance Payment Agreement as an operating device, after his initial acceptance of it as security of inventory. Thereafter, he put pressure on procurement to develop alternate suppliers, to replace Utility. Procurement responded to pressure from finance as reluctantly as finance had responded to pressure from *883 procurement. Ultimately, however, finance prevailed. In September 1952, Utility was no longer an essential supplier because other producers were available.
Meanwhile, as early as January 1952, Secretary Bendetsen had “deemed” the security of the Advance Payment Agreement tó be inadequate.
When the Army finally took action against Utility, in September 1952, the V-Loan had been in default for 15 months, and the advance payment security had been “deemed” inadequate for 8 months.
Obviously, the Army deferred action against Utility only until finance and procurement could reach agreement as to Utility’s non-essentiality. Utility’s insolvency was never in doubt.
Neither of the parties has given consideration to the alternative courses open to the Army, in the context of finance having ultimately prevailed over procurement.
The possibilities of alternative courses of action were limited by the negative facts (1) that once procurement developed other suppliers, Utility’s essentiality vanished under the two-pronged standard of essentiality imposed by the department and (2) that once Utility’s essentiality was gone, the Army was without authority to continue its assistance to the contractor, either by direct financing or through hardship relief.
The Army, of course, was well aware of these limiting factors. It knew that a determination of non-essentiality would automatically limit its authority to render financial assistance, and timed the determination accordingly, to suit procurement’s convenience.
Once the determination of non-essentiality was within the Army’s reach, there were open to it, on the positive side, the following courses of action (other than the one it followed): (1) to make the determination of non-essentiality, withdraw further assistance, let Utility slip into bankruptcy, wait for the inevitable failure of deliveries, and then to terminate the production contracts for default under their own terms; or (2) to terminate the production contracts for the convenience of the Government, with concomitant settlement payments, such termination to be made either before or after the deter- *884 ruination of non-essentiality, but in either event as part of the withdrawal of farther financial assistance.
The essence of plaintiff’s case is that the Army should have adopted the second alternative.
The production contracts all contained the clauses authorizing termination for the convenience of the Government. On two occasions (in August 1951 and in April 1952, while the availability of alternate suppliers was very much in question) procurement nevertheless considered invoking these termination provisions. The inferences are compelling that procurement (1) instigated these considerations as a way out of its difficulties with finance and (2) ultimately refrained from using the termination-for-convenience authority to avoid the payment of settlement costs and to find other means for terminating Utility’s contracts “in a manner most advantageous to the Government.”
In this proceeding the parties have joined issue only by indirection over the legality of the Army’s action. The Advance Payment Agreement, under which the Army invoked the default clauses of the production contracts, is on its face and by its terms a supplemental agreement of the production contracts. Its closing article provides that “* * * all the terms and conditions of the contract (or contracts) affected shall remain unmodified and in full force and effect and shall also apply in carrying out the provisions of this agreement.” Within the test of the agreement, moreover, there are many references to terminations with or without the fault of the contractor; but no provision, except the general catchall hereinabove quoted, specifies default for failure to provide additional security. Under the circumstances, effort at this time to decide the legality of the Army’s action would be premature.
With respect to plaintiff’s charges of fraud, the only legal question on which issue has been joined is whether or not plaintiff has made a prima facie showing of fraud. The briefs have much to say as to the qualities which may properly be said to characterize action as fraudulent in law. Consideration of these distinctions may be postponed for later discussion. The matter immediately at hand calls only for a resolution of facts.
*885 The writer’s conclusion is that there is a prima facie showing of bad faith on the part of the Army.
As early as January 1952, Secretary Bendetsen “deemed” Utility’s security of the Advance Payment Agreement to be inadequate, and directed liquidation of the advance payment at the earliest practicable date. Three months later, in April 1952, procurement agreed that additional business for Utility could not be considered until such time as the company’s financial position was considered to be satisfactory. Such an improvement was not then reasonably in- prospect. During the same month, procurement rejected a proposal to terminate Utility’s contracts for the convenience of the Government, to avoid the payment of $2 million in settlement costs, in order to seek a termination “in a manner most advantageous to the Government.”
During the next 6 months, from April to September 1952, procurement managed to induce finance to carry Utility. The contractor remained in business, incurring expenses for materials and labor, and performing its production contracts on schedule and in quality. When, finally, procurement was ready to concede that other suppliers were available, it had only to make the concession and leave the rest to the bankers’ bent of finance. Finance responded, and with a will, according to its lights.
Considering the departmental course as one (in which the operations of procurement and finance are combined), there is evident in it a contrived scheme to use Utility and then dump it.
Under the circumstances established by the facts now of record, the contractor, as a corporate entity, employing labor and buying materials from other suppliers, had a right to expect that its production contracts would not he terminated for default without the establishment of some fault on its part. The fact is undisputed that Utility’s deliveries were satisfactory, in quantity and quality.- There is no suggestion by defendant that Utility’s failure to improve its financial condition was the result of any abuse or lack of diligence on its part in its use of the financial assistance extended' to it by the Army. On such a record the contractor was entitled to a finding that the termination was without fault on its *886 part. Such a finding would automatically have converted the termination into one for the convenience of the Government, whereupon the contractor would have had a right to termination settlements.
The Army’s use of the default termination, after it had deliberately forced Utility into bankruptcy, was an arbitrary use of the contract provision, not founded on good faith in the course of conduct which preceded the termination.
The evidence thus sustains the essence of plaintiff’s charge. There is a prima facie showing that the Army forced Utility into bankruptcy in pursuit of a contrived default termination as a means of avoiding the settlement costs attendant upon a termination not based on the fault of the contractor.
It seems hardly possible that no one in the Army chain of command foresaw the end result. Surely the evidence invites the inference that some officers and officials of the Army subordinate to the Secretaries saw the picture whole, as it unfolded, and directed the course of events toward a predetermined end. Even Secretaries Bendetsen and Pearson reasonably should have foreseen the wrongful consequences of their actions. The evidence absolves them of conscious wrongdoing only because their respective duties were so carefully compartmentalized in relation to finance and procurement as to eliminate responsibility on the part of either for the results of their combined action. The Department, however, may not evade its responsibilities through the medium of an administrative vacuum. -
Plaintiff contends, in his brief, that the fraud issue vitiates the Army’s claims of privilege on both the public-interest and the work-product grounds. Defendant contends that the fraud issue is immaterial unless there is a prima facie showing of conscious fraud, accompanied by an intention to cheat or be dishonest.
On the basis of the foregoing analysis, it is unnecessary to evaluate either of these extreme contentions. There being a prima facie showing of bad faith on the part of the Army, the effect of allegations of fraud in the pleadings without a prima facie showing is not in issue. The inference that some of the officers and officials of the Army must have *887 foreseen the end result is sufficient answer to defendant’s requirement of conscious wrongdoing.
The writer prefers to rest the relationship of the fraud issue to the claims of privilege upon the element of necessity. On this basis the prima facie showing of bad faith establishes plaintiff’s right to discovery of all of the documents withheld, including advisory opinions which, under the rule of Kaiser, would be privileged, and the alleged work product of Army attorneys for which exemption is claimed under the rule of Hickman v. Taylor. I would apply only one caveat to this sweeping determination. Insofar as there may be, among the documents withheld, material prepared by Army attorneys after the claim arose, such documents should be reviewed by the commissioner to determine their validity as work product within the meaning of the Hide-man case.
The assembling of evidence in preparation for trial is the purpose of discovery. Where fraud is in issue, “every fact or circumstance from which a legal inference of fraud may be drawn is admissible. Any such fact, no matter how insignificant, may be shown, provided it bears at all on the point at issue.”[73] The reason for liberality in the admissibility of evidence in fraud cases is that fraud is not lightly to be inferred. Once there is a prima facie showing, however, the putative perpetrator of a fraud “will have no help from the law [but] must let the truth be told.”[74]
As said by this court, in Columbia Supply Co. v. United States, 54 Ct. Cl. 10, 19 (1918):
A wide latitude is permissible in the introduction of testimony tending toward the proof of fraud, and the courts justly frown upon attempts to restrict the fullest investigations as to its presence or absence from transactions wherein it is alleged to obtain.
Also, as the court said in Michigan Steel Box Co. v. United States, 49 Ct. Cl. 421, 441 (1914) :
Speaking of circumstantial evidence in cases involving charges of fraud, the Supreme Court declared in Castle v. Bullard, 23 How., 172, that such actions necessarily *888 give rise to a wide range of circumstances, for the reason that the intent of the defendant is more or less involved in the issue, and great latitude is justly allowed by the law to the reception of such evidence, while objections to it upon the ground of irrelevancy “are not favored,” because the force and effect of circumstantial facts usually and almost necessarily depend upon their connection with each other. Says the court: “Circumstances altogether inconclusive if separately considered may by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.”
Plaintiff is on sound ground in his contention that:[75]
* * * The documents sought bear directly on the issues in litigation. They are in defendant’s exclusive possession and cannot be reached by Utility without defendant’s acquiescence, which has been refused. The events involved in the documents occurred seven to nine years ago and other independent proof of their occurrence will be difficult if not impossible to produce. To deny discovery in those circumstances * * * would unduly prejudice Utility’s prosecution of its claim.
The establishment by plaintiff of a prima facie showing of bad faith on the part of the Army does not establish fraud as a fact in the trial of the action. Trial has not yet been reached. When it is reached, plaintiff must support the issue with such evidence as he may have been able to assemble, and must defend his position against whatever evidence defendant may be able to adduce to refute the inference. On the basis of the prima facie showing of bad faith, the fraud (if fraud is ultimately shown by a preponderance of the evidence to have been committed) either was perpetrated by or resulted from the actions of some of the very subordinates who prepared the documents now being withheld. No greater need for access to the withheld documents could be established.
The authorities are unanimous in holding that privilege of the kind asserted here is to be weighed against necessity, with the result depending upon the sound discretion of the court.
In this case, the public interest privilege should, in my opinion, give way to the plaintiff’s necessity for access to the *889 documents. With, respect to the documents withheld as the work product of Army attorneys, I would divide them into two categories, depending upon the date of their preparation.* Any such documents prepared before December 10, 1952 (the date of termination of Utility’s production contracts) should be produced, as not being properly within the work-product category. Any such documents prepared on or after December 10, 1952, should be submitted to the court for review and determination as to whether or not their production would contravene public policy as defined in Hickman v. Taylor.
VIII
The present Rules of the United States Court of Claims represent, “in substance, the third edition of the rules of this Court as initially revised on May 15,1951, after almost four years of work by a Committee of Commissioners,” to which “the Court had assigned * * * the task of preparing new rules of practice predicated on the Federal Rules of Civil Procedure.”[76]
“On October 15, 1958, the rules of the court [as initially revised on May 15, 1951] were again revised. In such revision this court for the first time adopted discovery procedures, as set forth in Rule 26 * * *. That portion of our Rule 26 which is pertinent to this discussion was adopted almost verbatim from Rule 34 of the Federal Rules. * * * ?? [77]
As noted by the learned editor of Moore’s Federal Practice :[78] “The purposes of the deposition-discovery procedure were well stated by Mr. Justice Murphy in his decision in the landmark case of Hickman v. Taylor. He said
The pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure. Under the prior federal practice, the pre-trial functions of notice-giving, issue-formulation and fact-revelation were performed primarily and inadequately by the pleadings. Inquiry into the issues and the facts before trial was nar *890 rowly confined and was often cumbersome in method. The new rules, however, restrict the pleadings to the task of general notice-giving and invest the deposition-discovery process with a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus civil trials in the federal courts no longer need to be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

% % % * %

* * * the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of “fishing expedition” serve to preclude a party from inquiring into the facts underlying his opponent’s case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge. whatever facts he has in his possession. The deposition-discovery procedure simply advances the stage at which the disclosure can be compelled from the time of trial to the period preceding it, thus reducing the possibility of surprise.
Professor Moore prefaced the foregoing quotation with the following editorial comment:[79]
Rules 26 to 37, providing for pre-trial discovery of testimony, pre-trial inspection of documentary evidence and other tangible things, and the examination of property and person, were an important innovation in federal procedure. The promulgation of this group of rules satisfied the long-felt need for legal machinery in the federal courts to supplement the pleadings, for the purpose, of disclosing the real points of dispute between the parties and of affording an adequate factual basis in preparation for trial. The Federal Rules, unlike the common law system of procedure, are not grounded on the supposition that the pleadings are the only or chief basis of preparation for trial. On the contrary, the limitations of the pleadings in this respect are recognized. In most cases under the Federal Rules the function of the pleadings extends hardly beyond notification to the *891 opposing parties of the general nature of a party’s claim or defense. It is recognized that pleadings have not been successful as a fact-sifting mechanism and that attempts to force them to serve that purpose have resulted only in making the pleadings increasingly complicated and technical, without any corresponding disclosure of the issues which it will be necessary to prove at the trial. Thus the Federal Eules provide for simplicity and brevity in pleadings, which in most cases will terminate with the answer ¿ and at the same time adapt the old and familiar deposition procedure to serve as a device for ascertaining before trial what facts are really in dispute and need to be tried. Experience in England, Ontario, and in a number of the states had shown that the most effective legal machinery for reducing and clarifying the issues was a preliminary examination, as broad in scope as the trial itself, of the evidence of both parties. Accordingly, Eules 26 to 37 were modeled upon the discovery provisions of those jurisdictions in which it had proved most successful, with such changes as were deemed necessary to safeguard the parties from the few abuses which were found to have developed.
Federal Eule 26 provides that “any party may take the testimony of any person, including a party, by deposition upon oral examination or written interrogatories for the purpose of discovery * * and that “after commencement of the action the deposition may be taken without leave of court * *
The rules of this court do not permit the use of depositions for discovery. Depositions may be taken only for use as evidence, and then only upon leave granted by the court or the commissioner predicated upon a finding that “it is impracticable for a commissioner to take such testimony.”
The purpose of this restriction upon the use of depositions was to prevent abuses and to obviate the necessity for policing the use of the deposition device in a court with nationwide geographic jurisdiction.
Our Eule 28, providing for pretrial procedures, was drawn from Federal Eules 16 and 36. The need for and purposes of pretrial procedures are the same in this court as in the district courts.
Discovery is an integral and indispensable part of pretrial procedures. The primary instrument, indeed the mainstay, of discovery in this court is our Eule 26. It was for this *892 reason that the call statute was amended in 1954 “to make it' clear that * * * Congress intended that the Court of Claims could issue rules which give to all litigants, private citizens and the Government alike, the same rights of pretrial discovery as is accorded to them in suits brought in the district courts * * [80]
With respect to the amenability of the United States to the discovery process, Moore “starts with the premise that the discovery rules are fully applicable to the United States as a party,” saying that the Federal Eules “make no exceptions for cases in which the United States is a party, except to the extent that certain of the sanctions otherwise available to compel compliance with orders of the court are by their nature inapplicable to the United States as a suitor.”[81]
The district courts have, of course, eschewed the application of sanctions in the nature of contempt citations where officers of the Government are involved. Where sanctions applicable to the Government are required, the usual practice is to give the Government a choice between compliance with the requisite discovery procedures and foregoing the prosecution of its suit or defense of the claim against it.
Subject to the foregoing modification, the district courts have uniformly held the Government to be amenable to discovery processes in cases wherein the Government is a litigant. The right of the Government to assert privileges peculiar to its sovereign nature, such as the executive privilege put forward in the instant proceeding, is universally recognized. Without exception, all of the courts (including the Supreme Court and the Court of Claims) have held that determination of the Government’s rights under such a claim of privilege is a function of the judiciary and not of the executive.
Nevertheless, the Government, in the instant proceeding, challenges the authority of this court to decide the questions of privilege here raised. The implications of its brief are unmistakably clear that unless the court’s decision arrives at a result compatible with the executive’s position in withholding the documents, the Government (speaking through the office *893 of tbe Attorney General) will consider the court to have transgressed upon the prerogatives of the executive.
Manifestly, if the court lacks the power to decide issues such as are here presented, the detailed examination of them represents no more than an exercise in semantics. The position of the Department of Justice appears to be that such exercises may, indeed must, continue until the court undertakes to decide against the Government. Then, and only then, will the constitutional issue be squarely presented.
The writer has already noted his conviction that there is no constitutional issue involved. Congress has given its consent for the sovereign to be sued, and has plainly stated its approval of rules of practice in this court “which give to all litigants, private citizens and the Government alike,” the rights of pretrial discovery.
The Congress can, at any time, withdraw from positions heretofore taken. If it be deemed wise to condition the sovereign’s consent to be sued upon its immunity from discovery, a formal expression of the Congressional will could impose the condition. Such an enactment would not be subject to constitutional challenge, and neither is the present expression of the Congressional will consenting for the sovereign to be sued without immunity from discovery procedures.
The only possible transgression of the constitutional separation of powers lies in the intransigent refusal of the Government (acting through the Department of Justice) to recognize the inherent powers of the judiciary.
This issue — the power of the judiciary to apply its processes to the sovereign in suits wherein the sovereign has consented to be sued — is of transcendent importance. It permeates the trial practice of the Court of Claims.
Individual attorneys in the Department of Justice are generally cooperative, to a high degree, in permitting discovery through the inspection of documents in the Government’s files. Were it not for such cooperation, and if cooperation by Government attorneys were the sole reliance of the court for discovery, trial practice in this court would face breakdown, so important has become the wide and frequent examination of Government files in the development of facts in Court of Claims litigation. The instant proceeding is *894 proof that the court cannot wholly rely upon cooperation as a matter of grace. Issues have arisen which must be decided.
These issues are of two kinds. One kind is represented by the individual exercise of judgment and discretion, as reflected in this opinion by the analyses of such precedents as Fireman's Fund, Hickman v. Taylor, Kaiser, and the finding and effect of a prima facie showing of fraud. Individual judgments may differ as to any of these. The exercise of individual discretion with respect to them is inherent in the judicial process.
The other segment of the issues here presented calls into question the amenability of the Government to the judicial process. It is exemplified by the failure of the Acting Secretary of the Army to identify the documents withheld beyond the use of catch-phrases and the refusal of the Department of Justice, upon request, to afford to the court the facts pertaining to the documents in any greater detail.[82]
On March 16, 1960, the writer addressed the following letter to the Assistant Attorney General (marked to the attention of the trial attorney) :
In the course of analyzing plaintiff’s motion for an order disallowing claims of privilege, I notice that plaintiff’s reference to the doctrine of Firemen's Fund Indemnity Co. v. United States, 103 F. Supp. 915 (19521, appears only in plaintiff’s reply brief (p. 11 et seq.).
The Firemen's Fund question of waiver was raised by plaintiffs in the Benson case, but was abandoned in the course of oral argument. The question has not, therefore, been passed upon by the Court of Claims.
I consider it an important question in the pending proceeding.
May I, therefore, be advised whether or not any of the documents withheld by the Army under its claims of privilege have been furnished to attorneys in the Department of Justice who are responsible for the conduct of this litigation. If so, I should like also to have a listing of the documents sufficient to identify them individually. It is believed that such identification can be supplied without indication of the content.
*895 Your response to this letter may include (by typewritten memorandum, with copy to opposing counsel) any comment you care to make concerning the applicability of the Firemen's Fimd ruling to the circumstances of the instant proceeding.
On April 28,1960, the Assistant Attorney General (acting through the Chief, Court of Claims Section) replied:
Your request for a list of certain documents has been noted. As you may recall, a similar request was made in the Benson case, mentioned in your letter. In that case the Attorney General, in his letter of July 30,1951 [sic, should be 1954], addressed to Mr. Willard L. Hart, Clerk of the Court of Claims, declined to enumerate documents which had been furnished to the Department of Justice in connection with that suit, thereby establishing a departmental policy in these matters.
Accordingly, the list you have requested cannot be furnished.
In response to the foregoing letter, request was made for reconsideration by the Department of its position. On May 5, 1960, further advice was received (1) that “copies of all of the documents in question were either furnished to this Department or made available to this Department’s attorneys in charge of the case,” but (2) that with respect to a listing of the documents,” * * * it has again been concluded that under the established policy of the Department an enumeration of any material furnished for trial preparation cannot be submitted to the Court.”
A distinction exists, of course, between the production of a document for examination by the trial judge and the identification of it, without disclosing its contents, sufficient to enable bim to form an enlightened opinion of what he has to decide.
This court, in the Kaiser Aluminum case[83] dealt with the presentation of the document to a commissioner for determination by him, after examination, of the question of privilege, and rested the process upon the element of necessity, which the court found to be lacking in that instance.[84] *896 One reason for the lack of necessity, however, was the detailed identification of the document theretofore given to the court by the agency head and the Attorney General.
Claims of executive privilege for non-disclosure of advisory opinions and claims of exemption of the work product of attorneys must be sifted by the trial court to determine their initial validity, unless the court is to accept (as the Government would have it do here) the unreviewed judgment of the executive in the description of the documents. The requisite sifting cannot be done without facts.
The fact that one judge may require a more extensive identification while another judge might require a lesser one is immaterial. Such discrepancies are part of the judicial process. Outright refusal by a litigant to supply information demanded by the court is (absent an abuse of discretion by the court) a challenge of the judicial process.
The fact that difficulties beset the path in the application of discovery procedures to the Government in this court is no answer to the immediate question of the amenability of the Government to those procedures. Discretion of a high order is required of the commissioners of the court in dealing with security matters, classified material, and such unique documents as the confidential reports of the Federal Bureau of Investigation. The Government must, however, under the law, rely upon that discretion. The court has established the pattern of discretion in Kaiser.
There is no indication that the documents here withheld under claims of privilege contain more than advisory opinions of a housekeeping nature. On the other hand, there is always the possibility that the Acting Secretary of the Army resorted to catch-phrase descriptions in order to avoid detailing identities of a more serious kind.
Throughout the preparation of this opinion the writer has been acutely aware of the paucity of information available to him in relation to the two categories of documents withheld. Previously noted are (1) plaintiff’s demand for dis-allowance of the claims of privilege for failure to identify the documents withheld with sufficient particularity to permit assessment of the validity of the asserted privilege and (2) the writer’s judgment that such a course should not be followed.
*897 The lack of information concerning the nature and content of the documents withheld nevertheless remains one of the most significant facts in the record. Initially founded on the use of judicially devised catch-phrases by the Acting Secretary of the Army, in his description of categories, the deficiency has been confirmed by the refusal of the Department of Justice, upon request duly made, to elucidate. This negative condition of the record suffices to constitute necessity, within the meaning of Kaiser, for the presentation of the withheld documents to the commissioner, for him to make the determination as to the privilege or exemption of each one, according to the standards and conclusions set forth in this opinion.
RECOMMENDATION OE COMMISSIONER
It is recommended that the court enter the following order:
Pursuant to plaintiff’s motion, filed on November 10, 1959, for an order disallowing the claims of privilege asserted by the Department of the Army in response to the court’s orders for call, issued on March 18,1959, and pursuant to the provisions of Pule 26 and Pule 86(b) (2), it is ordered that:
1. The claims of privilege so asserted by the Department of the Army are rejected and disallowed, subject to the conditions hereinafter stated.
2. The Department of the Army is directed to produce the documents withheld by it under said claims of privilege for inspection, copying, or photographing by the plaintiff. Such production shall be made within 30 days after the effective date of this order, at any Washington office during hours of any business day to be designated by it.
3. The Department of the Army may, at its election, and within 30 days of the effective date of this order, deliver any or all of the aforesaid documents to the trial commissioner for examination and determination by him, in accordance with the standards set forth in the opinion of the commissioner which accompanied his recommendation, as to the application of the claims of privilege to specific documents. Every document so submitted shall be accompanied by a statement in writing of the reasons for the exclusion of the document from the terms of paragraph 2 above. The order of the *898 commissioner applying or rejecting the claim of privilege to any such document so submitted shall be final, subject always to appeal for abuse of discretion.. Submission of documents to the commissioner as herein outlined shall constitute compliance, fro tcmto, with the requirements of paragraph 2 above.
4. In the event of failure or refusal by the Department of the Army to comply with this order, the commissioner shall proceed with the trial of the action, and shall exclude from evidence all testimony and documentary evidence in opposition to the claims of plaintiff or in support of the counterclaims of defendant.
Respectfully submitted.
W. Net EvaNS, Oorvrrdssioner.
On July IB, 1960, the court issued an order notifying the parties of their right to except to the commissioner’s opinion and recommendations. On December 1,1961, the following order was entered:
This matter is before the court on plaintiff’s motion for an order under Rule 26 for the production of certain documents withheld by the Secretary of the Army in responding to a prior order on call.
In withholding the documents in the first instance the Secretary of the Army asserted claims of privilege “under generally recognized concepts of privilege as understood in the law of evidence.” In responding to plaintiff’s motion for an order to produce, defendant joined issue under Rule 26 as fully as if the initial order had been issued under that rule. The matter was presented to the commissioner and to the court on the issue as to whether the asserted claims of privilege should be sustained or rejected.
On May 12, 1961, the court issued an order directing the Secretary of the Army to supply to the court information sufficient to identify each of the documents withheld as fully as possible without disclosing its contents. This order was issued “in conformity with the responsibility of the court to determine claims of privilege asserted under Rule 26,” and was predicated on the fact that in Kaiser Aluminum, 141 Ct. Cl. 38 (1958), the Government identified the withheld document, without disclosing its contents, in such detail as to enable the court to pass on the claim of privilege without itself examining the document.
*899 On September 28, 1961, there was filed “defendant’s response to the court’s order dated May 12, 1961,” consisting of a statement by the Assistant Attorney General to which was attached a letter addressed to the Attorney General by the Chief of the Litigation Division, Office of the Judge Advocate General, Department of the Army.
Defendant’s response, as supplemented by subsequent memoranda, indicates that some 200 of the documents initially withheld have now been released to plaintiff. The response lists 80 documents as still being withheld under various claims of privilege, among them being the claim not heretofore asserted of privilege based on the relationship of attorney and client. (Based on the papers now on file, the attorney-client privilege has not yet been asserted by the Secretary of the Army.)
The response further observes that “defendant finds itself unable to respond adequately” to that category of the court’s order of May 12, 1961, which sought possible identity with the “advisory comment” privilege upheld in Kaiser.
Having fully considered the contentions of the parties on the issues presented to the court in briefs and on oral argument, and the response to the court’s order of May 12, 1961, the court concludes that because of plaintiff’s allegation of fraud and the commissioner’s finding of a prima facie showing of bad faith, examination of the documents is necessary to the determination of the various claims of privilege on that issue. Therefore, it is—
ORDERED, That:
1. Within 30 days of the effective date of this order the Department of the Army shall deliver all of the withheld documents to the trial commissioner for examination and determination by him, in accordance with the standards set forth in the opinion of the commissioner which accompanied his recommendation of July 11, 1960, as to the allowance or rejection of the claims of privilege asserted as to specific documents. Every document so submitted shall be accompanied by a statement in writing of the claim or claims of privilege asserted with respect to it and of the reasons why such claim or claims should be sustained. In these submissions the attorney-client privilege may be asserted by the Secretary of the Army where deemed applicable. The order of the commissioner sustaining or rejecting the claim or claims of privilege as to any such document shall be final, subject always to review for abuse of discretion.
2. In lieu of submissions to the commissioner as outlined in paragraph 1, the Department of the Army may, at its election, and within 30 days of the effective date of this order, produce any or all of the aforesaid documents for *900 inspection, copying, or photographing by the plaintiff at any Washington office during the hours of any business day to be designated by it, upon notice to the plaintiff and to the commissioner.
3. In the event of failure or refusal by the Department of the Army to comply with this order, all claims of privilege asserted in defendant’s response to the court’s order of May 12,1961, shall be deemed rejected and disallowed by the court, whereupon the commissioner shall proceed with the trial of the action and may in his discretion exclude from evidence any or all testimony and documentary evidence in opposition to the claims of plaintiff or in support of the counterclaims of defendant.
By The Court
MarviN JoNes, Chief Judge.

 There has as yet been no opinion rendered by the court in this ease.

 Defendant’s motion to strike is directed at “plaintiff’s First Count along with paragraphs 8 through XI, inclusive, 16 through- 18, inclusive, and 25 of the consolidated petition.” Plaintiff’s First Count seeks recovery “of the balance outstanding on the V-Loan when defendant demanded payment thereof” plus $2,000,000 “on account of losses sustained on * * * contracts awarded to Utility, in May and June, 1950.” The specified paragraphs contain narrative statements underlying the First Count.

 Simultaneous motions for calls upon the Department of Defense and the Federal Reserve Bank of New York are not now in issue.

 The response is contained in a letter dated- August 21, 1959, directed to the clerk of the court and signed by the Acting Secretary of the Army.

 Its brief (p. 40) duly notes (1) that “Rule 26 was available to tbe plaintiff at the time it filed its extensive motion for call under Rule 27 so it can be presumed that plaintiff’s only purpose in now seeking this court’s order for additional discovery of the same documents, is to avoid the privilege given to the Government under 28 U.S.C. 2507(a) and obtain another assertion of privilege which, under a decision of this court can be only on the ground that the privilege claimed must be that ‘as known and understood in the law of evidence’ ”; and (2) that “* * * the Acting Secretary of the Army has already based the claim of privilege equally upon the ground that the documents concerned are privileged as understood in the law of evidence.”

 “The instant claim of privilege arises under Rule 27 * * * based upon 28 U.S.C. 2507(a) * * *. * * * It has been suggested that 28 U.S.C. 2507(a) confers an absolute privilege. See Berger and Krash, Government Immunity from Discovery, 59 Vale L.J. 1451, 1461, footnote 54 (1950). See also Pollen v. United States, 85 C. Cls. 673, 677 (1937).” P. 39, and at p. 44: “Any argument, or determination that the privilege asserted by the Army in this ease does not exist is, of course, fraught with constitutional implications (United States v. Reynolds, 345 U.S. 1, 6) which it is not, however, considered necessary to set out at this posture of the proceedings. See, however, The Power of the President to Withhold Information from the Congress, compiled by the Committee on Constitutional Rights, Committee on the Judiciary, united States Senate, 85th Cong. 2d Sess., pp. 1-85.”

 The Reynolds decision contains the following passage (345 U.S., p. 6) : “We have had broad propositions pressed upon us for decision. On behalf of the Government it has been urged that the executive department heads have power to withhold any documents in their custody from judicial view if they deem it to be in the public interest.[9] Respondents have asserted that

While claim of executive power to suppress documents is based more immediately upon R.S. § 161 (see supra, note 4), the roots go much deeper. It is said that R.S. § 161 is only a legislative recognition of an inherent executive power which is protected in the constitutional system of separation of power.
the executive’s power to withhold documents was waived by the Tort Claims Act. Both positions have constitutional overtones which we find it unnecessary to pass upon, there being a narrower ground for decision. Touhy v. Ragen, 340 U.S. 462 (1951); Rescue Army v. Municipal Court of Los Angeles, 331 U.S. 549, 574-585 (1947).”

 The language in Kaiser upon- which defendant relies for connecting “executive privilege with sovereign immunity” is the statement (141 Ct. Cl. p. 46) that: “Executive privilege is a phase of release from requirements common to private citizens or organizations. * * * It finds its strongest expression in the government’s absolute freedom from suit except as it may consent.”

 Essentially, this lawsuit represents a contest between the unsecured creditors (suppliers) of utility and the Government as a secured creditor.

 There were 10 with the Army (Signal Corps), 2 with the Air Force, and 1 with the Navy.

 The Defense Production Act of 1950, 50 U.S.C. Appendix 2091, as implemented by Executive Order 10161, of September 9, 1950, and Regulation V of the Federal Reserve Board.

 utility was seeking a credit of $1.5 million, as being requisite to its need.

 This determination represented the reiteration of a determination made by the same man in January 1952.

 The Army had given utility until the close of business on October 9 to present a satisfactory plan for continuing production.

 A further order was entered by the District Court on August 21, 1956.

 Plaintiff alleges that the inventory had a “going concern” value of $1.9 million.

 Plaintiff’s Brief, p. 63.

 These documents “have been removed from the approximately twenty to twenty-five linear feet of files which are being made available to the plaintiff.” The court Is not informed whether the volume of documents withheld should be measured by the page or by the foot.

 Plaintiff’s Brief, p. 4.

 Defendant’s Brief, p. 42 et seq.

 Plaintiff’s Brief, p. 6, footnote 2.

 United States v. Grayson, 166 F. 2d 863 (2d Cir. 1948). United States v. Andolschek, 142 F. 2d 503 (2d Cir. 1944).

 Bank Line v. United States, 76 F. Supp. 801 (S.D.N.Y. 1948), writ of prohibition denied, 163 F. 2d 133 (2d Cir. 1947).

 Bowles v. Ackerman, 4 F.R.D. 260 (S.D.N.Y. 1945).

 Unites States v. Kohler Co., 9 F.R.D. 289 (E.D. Pa. 1949). United States v. Cotton Valley Operators Committee, 9 F.R.D. 719 (W.D. La. 1949), affirmed per curiam 339 U.S. 940 (1950).

 Mitchell v. Bass, 252 F. 2d 513 (8th Cir. 1958). Durkin v. Pet Milk Co., 14 F.R.D. 385 (W.D. Art. 1953). Walling v. Richmond Screw Anchor Co., 4 F.R.D. 265 (E.D.N.Y. 1943), affirmed 154 F. 2d 780 (2d Cir. 1945), cert. den., 328 U.S. 870 (1946). Fleming v. Bernardi, 4 F.R.D. 270 (N.D. Ohio 1941).

 Citing Boske v. Comingore, 177 U.S. 459 (1900); Stegall v. Thurman, 175 F. 813 (1910); and Ex parte Sackett, 74 F. 2d 922 (9th Cir. 1935). Each of these decisions, it may be noted, antedated the adoption of the Federal Rules of Civil Procedure. Cf. Durkin v. Pet Milk Co., 14 F.R.D. 385, 390 (W.D. Ark. 1953).

 United States v. Beekman, 155 F. 2d 580 (C.A. 2d Cir. 1946).

 Immediately following the passage hereinabove quoted (“The government must choose,”), the court said: “Nor does it seem to us possible to draw any line between documents whose contents bears directly upon the criminal transactions, and those which may be only indirectly relevant. Not only would such a distinction be extremely difficult to apply in practice, but the same reasons which forbid suppression in one case forbid it in the other, though not, perhaps, quite so imperatively. * * *”

 For an extensive review of the authorities, in a wage and hour case where the Issue arose under Federal Rule 34, see Durkin v. Pet Milk Co., 14 F.R.D. 385 (W.D. Ark. 1953).

 345 Ü.S. 1, 11.

 141 Ct. Cl. 38, 49.

 141 Ct. Cl. 38, 51.

 141 Ct. Cl. 38, 50.

 In its brief before the appellate court the libellant stated that it was not ashing for production of the findings or opinion of the Board of Inquiry, but “only * * * for testimony * * * of the witnesses taken before the Board of Inquiry * *

 163 F. 2d 133, 137.

 Article C-15 of the Navy Department Courts and Boards, 34 Code of Fed. Reg., section 12.15.

 76 F. Supp. 801, 803 et seq.

 The Act of March 9, 1920, 41 Stat. 525, as amended by the Act of December 13, 1950, 64 Stat. 1112; 46 U.S.C. §§741-752.

 46 U.S.C. § 743.

 The Act of August 2, 1946, 50 Stat. 842, as amended by the Act of August 1, 1947, 61 Stat. 722.

 28 U.S.C. § 1346(b).

 28 U.S.C. § 2674.

 28 U.S.C. 1946 ed. § 932.

 28 U.S.C. 1946 ed. § 761.

 The Act of March 3, 1887, 24 Stat. 505.

 Ibid., §§ 1 and 2.

 Ibid., §4.

 If defendant’s contention means less than that the united States, in consenting to suit under the Tucker Act, retained unto itself complete immunity from discovery processes, in relation to claims of executive privilege, the writer is under a misapprehension with respect to it.

 28 U.S.C. § 2071.

 133 Ct. Cl. 11, 18.

 The Act of September 3, 1954, 68 Stat. 1226, 1246; 28 U.S.C. 2507.

 133 Ct. Cl. 11, 21.

 Walling v. Comet Carriers, Inc., 3 F.R.D. 442 (S.D. N.Y. 1944).

 1950 Ed., Vol. 4, p. 1176.

 Vol. 4, pp. 1176-1177.

 Vol. 4, p. 1180.

 Id.

 From Durkin v. Pet Milk Co., 14 F.R.D. 385, 391 (1953).

 153 F. 2d 212, 223.

 4 Moore’s Federal Practice, 1950 ed., 1119.

 329 U.S. 495, 504.

 329 U.S. 495, 504.

 Id.

 329 U.S. 495, 507 et seq.

 329 U.S. 495, 516-519.

 Cf. Tolman, Discovery Under the federal Rules: Production of Documents and the Work Product of the Attorney, 58 Col. L. Rev. 499, 514 (1958).

 Vol. 4, pp. 1119-1149.

 For illustrative situations to which the protection of Hickman v. Taylor has been applied, see: Fey v. Stauffer Chemical Company, 19 F.R.D. 526 (D. Neb. 1956), wherein petitioner was denied discovery of a file containing legal opinions of counsel for an insurance carrier, on questions of liability, loss reserves, and settlement possibilities and desirabilities; and Slifka Fabrics v. Providence Washington Insurance Company, 19 F.R.D. 374 (S.D.N.Y. 1956), wherein movant was denied access to a memorandum of a conference in respect to plaintiff’s claims held at the defendant’s office, after examination of the document by the court.
For illustrative situations wherein the production has been denied, see: Tobacco and Allied Stocks V. Transamerica Corporation, 16 F.R.D. 534 (D. Del. 1954), wherein letters written to counsel in another case were held not to be part of his work product in the instant case; and Rediker v. Warfield, 11 F.R.D. 125 (S.D.N.Y. 1954), wherein records of conferences in which attorneys were involved were found to be “antecedent to commencement of the action, and * * * not in the course of preparation for trial, or * * * in anticipation of prospective litigation,” and therefore not within the work-product protection.

 329 U.S. 495, 511-512.

 Vol. 4, 1950 ed., 1176.

 In connection with tMs proceeding, and In support of Ms assertions relating to fraud, plaintiff has filed (1) copies of 75 documents and (2) transcripts of proceedings (a) before the Army Contract Adjustment Board and (b) In the matter of utility Electronics Corporation (In the United States District Court for the District of New Jersey). Also on file are the contracts “referenced in plaintiff’s brief.”

 See defendant’s Brief, p. 38.

 Copper Process Co. v. Chicago Bonding & Insurance Co., 262 Fed. 66, 72 (1920).

 Clark v. United States, 289 U.S. 1, 15 (1933).

 Plaintiff’s Brief, p. 62.

 Foreword, Rules of the United States Court of Claims, as revised December 2, 1957.

 Benson v. United States, 133 Ct. Cl. 11, 13 (1955).

 Vol. 4, 1950 ed. 1013.

 Vol. 4, 1950 ed., 1012.

 Benson v. Unitea States, 133 Ct. Cl. 11, 21 (1955).

 Vol. 4, 1950 ed., 1161.

 The refusal of the Department of Justice to divulge facts identifying the withheld documents (without disclosing their content) has assumed greater importance in the final analysis than was realized by the writer when he made the request.

 141 Ct. Cl. 38 (1958).

 “When the head of an agency claims privilege from discovery on the ground of public interest, which is recognized as a basis for the claim, it seems to us a judicial examination of the sought-for evidence itself should not be required without a much more definite showing of necessity than appears here.” 141 Ct. Cl. 50.